# CHARLESTON.

### DUMPHY v. NORFOLK & WESTERN RY. CO.

### Submitted March 6, 1918.  Decided March 19, 1918.

1. COMMERCE—*Federal Employes Liability Act—Engaged in ''Interstate Commerce.''*

   Plaintiff, an electrical engineer, employed by defendant to instruct its motormen how to operate motors, in interstate business, was while so employed engaged in interstate commerce within the meaning of the Federal Employers Liability Act. (p. 125).

2. SAME—*Federal Employers' Liability Act—Injury While Engaged in Interstate Commerce—''Employee.''*

   The duties of such employee requiring him to ride passenger trains and freight trains, and at times to board them while in motion, and whose time, pay and service began and ended at a certain point on defendant's railway remained such employee within the meaning of said act so long as he was engaged in the discharge of his duties as such and while attempting to board a

freight train to get back to his initial point in order to complete his day's service. (p. 126).

3. MASTER AND SERVANT—*Federal Employers' Liability Act—Assumption of Risk—Reliance on Master's Care.*

Such servant, when so employed, assumes all the ordinary risks of his employment, including the risk of mounting and riding moving trains, but he does not assume extraordinary risks and hazards, the result of negligence on the part of the railway company or those for whom it becomes responsible. He has the right to assume that his employer will not subject him to such extraordinary risks and hazards, and may act on this assumption, unless they are so open and apparent as to cause a man of ordinary prudence to see and appreciate them. (p. 127).

4. SAME—*Federal Employers' Act—"Negligence."*

A railway company is negligent within the meaning of said act when its railway engineer refuses or neglects to obey the order of his superior officer to stop or slow down at a particular point and pick up such employee engaged in interstate commerce having knowledge of such order and relying thereon, or so negligently manages his engine and train as to do injury to such employee lawfully on his train. (p. 127).

5. DAMAGES—*Excessive Damage—Loss of Arm and Leg.*

A verdict in favor of such an employee so injured, of the age of thirty one years, for $30,000.00, for the loss of his right arm above the elbow and of his left leg below the knee, and for mental and physical pain and suffering endured, not shown to have been influenced by bias, prejudice, partiality, corruption or mistake on the part of the jury, or misdirection of the court, will not be set aside as excessive. (p. 131).

Error to Circuit Court, Mingo County.

Action by Chester A. Dumphy against the Norfolk and Western Railway Company. Judgment for defendant and plaintiff brings error.

*Reversed; verdict and judgment rendered for plaintiff.*

*Charles J. Shuck* and *Wiles & Bias,* for plaintiff in error.

*Theodore W. Reath* and *Holt, Duncan & Holt,* for defendant in error.

MILLER, JUDGE:

Plaintiff in error was plaintiff below in an action brought by him against defendant for personal injuries alleged to have

been sustained by him because of the negligence of the defendant, while employed in interstate commerce.

The action was founded upon the Federal Employers Liability Act of Congress, Fed. St. Anno., 1909 Suppl., section 1, page 584, and the judgment complained of, pronounced upon defendant's motion, set aside the verdict in favor of plaintiff for $30,000.00, and awarded the defendant a new trial.

The issues involved on the trial and disposed of by the various rulings of the court in the admission and rejection of evidence, the giving and refusing of instructions to the jury, and the motion of the defendant for a new trial awarded, are as follows: (1) Was plaintiff, at the time of his injuries engaged with defendant in interstate commerce? (2) Was he at the same time an employee in the service of the company, and not a passenger or trespasser? (3) Was there any proof of negligence rendering defendant answerable in damages? (4) Were the damages found by the jury excessive?

Plaintiff in support of the errors assigned for reversal affirms the first three propositions, and negatives the fourth, while the defendant, of course, would negative issues one, two, and three, and affirm the fourth.

On the first question the evidence shows that plaintiff was an electrical engineer, employed by defendant with others to instruct its motormen how to operate its electric motors over that part of its railway, then recently electrified, between Bluestone Junction and Vivian, West Virginia, stattions on defendant's road on the western slope of the Flat Top Mountain. His headquarters were at the City of Bluefield, east of Bluestone Junction, and where he made his reports to the train dispatcher of that division, and also received his orders, but his time and pay began and ended at Bluestone Junction. He did not always get upon the motors at Bluestone Junction; but was required to get them wherever they might be in service, and to do this as well as to reach headquarters he was obliged to ride passenger or freight trains as occasion might require, and was provided with passes for this purpose. These motors were employed as pushers in helping the steam engines with their loads of coal

up the Flat Top Mountain, and in hauling empties back to the coal fields, employed in interstate commerce, their work as helpers beginning generally at North Fork, a few miles east of Vivian. This made plaintiff an interstate employee generally, and it is not controverted that on the day of his injuries and up to the time he was relieved at North Fork he had been employed in interstate commerce. The controversy is as to whether he was so employed at the time he was injured.

On the second question the facts are these: On April 2, 1915, just before he was injured, plaintiff had left the motor he had been riding that day at North Fork about nine or nine thirty o'clock in the evening, but his duties and time and pay did not end until he had made his way back to Bluestone Junction. He was required to report for orders the following morning at Bluefield. To enable him to do this, Peters, the trainmaster at North Fork, at the request of Quinn, then engaged in testing the side rod equipment on Motor No. 2507, now Chief Electrical Engineer, with headquarters at Roanoke, Virginia, in the presence of plaintiff, called up Snidow, then assistant yard master at Eckman, a station west of North Fork, and directed him to order eastbound freight No. 84, designated "First 84", as plaintiff swears, "to pick him up at North Fork", and plaintiff also swears that immediately after so phoning Snidow, Peters turned to him and said, "You wait here and 84 will slow down for you." Plaintiff also swore, and there is little or no evidence to the contrary, that he and other trainmen were frequently required in the discharge of their duties to jump or board moving trains, and that his orders when caught out on a trip were to get back the best way he could. He says he could have gone back to Bluestone Junction on the motor he was riding that day, but could not have reached headquarters that night, unless he got No. 84 at that point or at Morgan, a small station west of Bluestone Junction, where No. 84 usually took water, but that when he asked Peters what he should do, Peters said "You stay right here and I will 'phone Eckman and have 84 pick you up." Plaintiff did as directed, and waited at North Fork until No. 84 came along

about twelve o'clock that night.   He saw the train approaching around a curve, and when close enough he says he gave the engineer a signal to which the latter responded by two blasts of the whistle, and plaintiff made preparations to mount the train, but when the engine passed him he thought it was moving too fast to get upon it; that he then picked out a car with steps and ladder, and when it reached him, and thinking the train had slowed down enough to make it safe to get aboard, he grabbed the round of the ladder with both hands and landed safely with his knees in the stirrup; that the engine then gave a sudden violent jerk forward throwing him out of the stirrup, and breaking the hold of his right hand and then of his left, and throwing him under the train, resulting in the cutting off of his right arm and his left leg, the injuries of which he complains.

The only substantial conflict in the evidence is whether the order to "First 84" was to "slow down" and pick up plaintiff, as he swears, or to "stop" and pick him up, as Peters and Snidow swears.   Garrett, the engineer on No. 84, admits that he received the order, and that it was read to him, and that he put it in his pocket, but professes that when he reached Bluefield and there learned of plaintiff's injuries he looked or felt in his pocket for the message, but could not find it.   Snidow and his clerk to whom he dictated the message swear no record of the message was kept, although it was signed H. C. Weller, Superintendent, and neither the original nor a copy of the message was produced on the trial.

There is no question that when actually employed on the motors the day of his injuries, plaintiff was assisting in hauling interstate trains; nor is it controverted that the train doing him the injury was an interstate train.   Nor is it controverted that his employment required him to have his headquarters and report at Bluefield; nor that his time and pay, unless otherwise ordered, began and ended at Bluestone Junction.   He spent the night of April 1, at North Fork, but this was upon special order of his superior, and at his or the railway company's expense.   He had no such order for the night of April 2nd, but in trying to make his way back to Bluestone Junction and to headquarters he was acting under

his general orders. Proper performance of his duties called for rest at headquarters and reporting for duty the next morning to the train dispatcher, and then at Bluestone Junction, where his time and pay began. The facts clearly distinguish this case from *Harris* v. *City & Elm Grove R. R. Co.*, 69 W. Va. 65. In that case Harris was riding on his pass to the place where his work began when he was injured. He was not on duty; his time and pay had not begun; he was in no sense in the service of the company, and the liability of the company to him was that of carrier to passenger. Not so in this case. Under plaintiff's employment it was as much his duty to get back to Bluestone Junction and to headquarters, as it was to ride the motors and instruct motormen, and until his duties begun in the morning were concluded at night he must be regarded as being engaged in interstate commerce. *Dickinson* v. *West End Street Railway Co.*, 177 Mass. 365, *Pryor* v. *Bishop*, 234 Fed. Rep. 9, *Bennett* v. *Lehigh Valley R. Co.*, 197 Fed. Rep. 578, *Lamphere* v. *Oregon R. & Navigation Co.*, 193 Fed. Rep. 248, in our opinion do not controvert this proposition. They are all distinguishable on the principles of *Harris* v. *City and Elm Grove R. R. Co.*, supra. Nor do we think *Erie Railroad Co.* v. *Welsh*, 242 U. S. 303, in point or persuasive authority for defendant on the proposition involved. In that case the train crew were engaged in miscellaneous duties, and at the particular instant of the injuries, they were engaged in intra state commerce. Here the plaintiff's duties were confined to interstate traffic, and as stated, the train he was attempting to ride back to the initial point of service was interstate. It was not contended that at the time of his injuries plaintiff was doing intra-state business. There were, therefore, no controverted facts calling for their submission to the jury upon the principles enunciated in *L. & N. R. R. Co.* v. *Parker*, 242 U. S. 13. It is not pretended that plaintiff was engaged in intra state business; the main contention is that he was not at the time of his injury in the service of the defendant at all; but had been relieved of all duties, and that his time was his own, and that his riding or attempt to ride train No. 84 was a mere convenience permitting him to get to his place of residence or headquarters.

But unless we can say that though still under pay and required as a part of his employment to get back to Bluestone Junction, where his duty and pay for the day ended, he was not then in the service of the company, and the company owed him no duty as an interstate employee, instruction number seven, for defendant, rejected, was properly rejected. Its purpose was to affirm the proposition which we are disposed to deny, namely, that defendant at the time plaintiff was injured owed him no duty as such employee. In *Erie Railroad Co.* v. *Winfield,* 244 U. S. 170, in accord with our case of *Easter* v. *Virginian Railway Co.,* 76 W. Va. 383, it was decided, that in leaving the yard after his day's work an employee is still engaged in commerce, interstate or intra state, as the fact may be. In *Great Northern Ry. Co.* v. *Otos,* 239 U. S. 349, it was decided that a car, coming from another state, which is merely delayed in the state of destination before reaching, and which does finally reach its destination, is not, by reason of such delay, withdrawn from interstate commerce, and the operation of the safety appliance act. To the same effect is *St. L., San Francisco & Texas Ry. Co.* v. *Seale,* 229 U. S. 156. As we have said, plaintiff's duties had not ceased when he reached North Fork. True, he was there relieved of duties on the motor, but he was still under pay of the defendant with a positive duty to return to Bluestone Junction; until he had done so, and had had a reasonable time to get away to Bluefield, he was still a servant of defendant, upon the principles of *Erie Railroad Co.* v. *Winfield,* and *Easter* v. *Virginian Railway Co., supra.*

But to render defendant liable it must have been guilty of negligence within the meaning of the federal statute, and defendant's counsel argue that its negligence must have been the proximate cause of the injury and not the contributory negligence of the plaintiff. But for the statute contributory negligence would defeat recovery, but section 3 of that statute says, "contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employe, * * * * *", etc. The authorities say that an employee assumes all the ordinary risks of his employment, and can not recover

for injuries sustained thereby, but that he does not assume extraordinary risks and hazards, the result of the negligence of the defendant or of those for whom the carrier becomes responsible. *Gila Valley, G. & N. Ry. Co.* v. *Hall*, 232 U. S. 94; *Seaboard Air Line Ry.* v. *Horton,* 233 U. S. 492; *Southern Ry. Co.* v. *Gadd*, 207 Fed. Rep. 277; *Northern Pacific Ry. Co.* v. *Maerkl*, 198 Fed. Rep. 1. And according to the highest federal authority an employee has the right to assume that his employer will not subject him to extraordinary risks and hazards while performing his duties, and unless such risks and hazards are so apparent or great as to cause a man of ordinary prudence to see and appreciate them and to avoid them, the negligence of the railway company will render it liable according to the statute. *C. & O. Ry. Co.* v. *De Atley*, 241 U. S. 310, and cases cited.

That defendant was negligent on the night of April 2, 1915, there can be no doubt. The engineer received his order, but neglected to obey it. Plaintiff admits he assumed the ordinary risks incident to his employment, including that of getting aboard moving trains, when required, as it appears railway trainmen are at times required to do. He swears that on the night in question his judgment was that at the instant he undertook to get aboard the train it had slowed down to a speed not exceeding twelve miles per hour, and that it was reasonably safe for him to attempt to get aboard, and that he safely mounted the car selected by him, and would have succeeded in getting to a place of safety, but for the subsequent negligence of the engineer in causing the sudden jerking of the train, and the breaking of his hold upon the car and throwing him under the train. True some of the witnesses say the train did not stop or slow down, and was running at the rate of from fifteen to twenty miles per hour; but the engineer had orders to stop or slow down; according to the evidence he did neither, and was therefore negligent in that duty. But plaintiff had the right to assume the train would stop or slow down to enable him to get aboard; he thought at the time it had slowed down; the facts involved were for the jury, who by their verdict must have decided them according to the contention of the plaintiff. The facts

are very similiar to those in the De Atley case and we think the principles of that case control this. Apropos to the case here presented the court in that case says: "According to our decisions, the settled rule is, not that it is the duty of an employee to exercise care to discover extraordinary dangers that may arise from the negligence of the employer or of those for whose conduct the employer is responsible, but that the employee may assume that the employer or his agents have exercised proper care with respect to his safety, until notified to the contrary, unless the want of care and the danger arising from it are so obvious that an ordinarily careful person, under the circumstances, would observe and appreciate them." Citing *Gila Valley Ry. Co.* v. *Hall*, and *Seaboard Air Line* v. *Horton, supra.* The verdict should not have been set aside on the question of negligence of the plaintiff.

Lastly, was the verdict excessive? Dumphy was thirty one years of age, educated for his particular profession or calling, that of an electrical engineer; he was then earning $1500.00 per year; his life expectancy was thirty six years. He swears he has tried in vain to get employment, on account of his physical disabilities, the result of his injuries. He suffered great mental and physical pain, and is rendered a cripple for life, and unfitted for his profession. It is argued that $30,000.00, the amount of the verdict, at 6% would produce $1800.00 per annum, $300.00 more than he was earning when injured; but this theory allows nothing for taxes, loss of time, expenses, and the uncertainty of keeping the money invested at the rate of 6%. We think that 4% net would be as much as one of ordinary financial ability could reasonably expect to realize upon his investments. Few persons do that well during a long period of time. Approved annuity tables say that the value of one dollar at 4% for a person of the age of 31 years is 17.5885, and to purchase annuity of $1500.00, for one of that age, would require 1500 times 17.5885, or $26,-382.75. Giauque and McClure, Dower and Curtesy Tables, p. 196-7. The difference between this sum and the amount of the verdict would not be an unreasonable allowance for the costs and expenses in obtaining a cure and for mental and physical pain suffered, and which plaintiff will likely con-

tinue to suffer for a long time if not for the remainder of his life. Neither the federal statute nor the state law fixes any limitation on the amount recoverable for personal injuries, as our statute does in the case of death by wrongful act. The only limitation is that the amount shall not be so gross as to evince mistake, prejudice, partiality, or corruption on the part of the jury, or some misdirection of the court. 4 Sedgwick on Dam., section 1325; *Normile* v. *Wheeling Traction Co.,* 57 W. Va. 132; *C. & O. Ry. Co.* v. *Fortune,* 107 Va. 412; *Southern R. R. Co.* v. *Smith, Id.* 553; *Nichols* v. *Camden, &c. Ry. Co.,* 62 W. Va. 409, 416; *Goshorn* v. *Wheeling Mold & Foundry Co.,* 65 W. Va. 250. True in the case of death of an employee the federal statute as construed gives to beneficiaries of the deceased damages only for the pecuniary loss sustained. *Chafin* v. *N. & W. Ry. Co.,* 80 W. Va. 703, 93 S. E. 822, and cases cited.

The elements generally allowed to enter into the amount of damages found for personal injuries are, in case of total or partial disability caused thereby, the character of the employment, the earning powers of the employee, his age, and previous physical health and condition, and often his prospects for future advancement in his trade or calling have been allowed to influence verdicts. The Supreme Court of the United States in cases arising under the federal act have declined to deal with the question of mere excess of damages, even where the action is for the death of a servant, and the right of recovery is limited to pecuniary loss of the beneficiaries, holding that it does not present a question for re-examination upon writ of error to that court. *Southern Ry. Co.* v. *Bennett,* 233 U. S. 80. But our practice is different. We may in cases brought here by writ of error review judgments on the question of damages, and affirm or reverse on this ground. Our decisions contain many examples of the practice which are familiar to the profession and need not be cited. And such we think is the general rule of practice in other states.

The best and most approved method of determining the quantum of damages, perhaps, is the probable pecuniary loss sustained with something added for mental and physical pain

suffered and to be endured, and for loss of time, and the costs and expense of being cured. And in case of total disability it is fair to take into consideration as already indicated the present value of an annuity equal to the earning capacity of the plaintiff, and a sum sufficient in the judgment of the jury to compensate for other damages incurred. Observing this rule how can we say, how could the trial court say, the verdict in the case at bar is excessive? The cases reported in the books show that verdicts in such cases are as variant as the facts and circumstances involved. No one case can serve as an exact guide or rule for other cases. We cannot review the many decisions on this subject. For examples of verdicts sustained and not sustained for the loss of a leg we can best refer the profession to 4 Sedgwick on Damages, section 1356, p. 2721; and for the loss of an arm, similar examples will be found in the same section at p. 2725. Depending on the circumstances and conditions already mentioned it will be found that verdicts ranging all the way from $2500.00 to $25,000.00, and for the loss of an arm, from $6,500.00 to $12,000.00, have been sustained. And in *Goshorn* v. *Wheeling Mold & Foundry Co., supra,* we sustained a verdict for $16,777.75, for the loss of an arm by an employee thirty five years of age, who the proof showed was earning only thirty cents per hour. In *L. & N. R. R. Co.* v. *Fox,* 74 Ky. 495, a case relied on by defendant's counsel, many cases are reviewed, and at page 510, it is said: "We know of no better means of arriving at a solution of the question whether the amount of the verdict in this case was the result of passion or prejudice than by comparing the injuries suffered by the appellee with the injuries sustained by the plaintiffs in similar actions, and then comparing this verdict with the verdict in those cases." That case was a passenger case and the verdict was $35,500.00, for loss of right foot and injury to left leg. The court in that case set aside the verdict as being excessive, apparently because it was found that the amount was greater by several thousand dollars than the verdicts in any of the cases cited and reviewed. On the other hand we find that in Texas a verdict for $35,000.00 in favor of a brakeman earning more than $100.00 per month with prospects of

being promoted to conductor with a higher salary was affirmed as not being excessive. Other cases affirming verdicts of like size might be cited.

Of course there is a great variety of opinion among the courts on this subject, but until Congress shall limit the amount of recovery in such cases we do not see how we can invade the province of the jury and take away from them the right to fix the amount of damages, unless upon some one or more of the grounds referred to.

Two points not covered by what has already been said should not perhaps be overlooked. First, it is complained that the court erroneously sustained the objection of plaintiff to certain question propounded the witnesses Garrett and Maston. A sufficient answer is that there was no proffer showing what the answers would have been.

Another point is that the court erroneously declined to permit defendant's counsel to ask plaintiff whether he had not given his counsel the facts on which the original declaration was predicated. The original declaration was that the yard master's order was to stop and pick him up, instead of to slow down and pick him up. We think the ruling of the court was right on the principle announced in *Bartley* v. *Western Maryland Ry. Co.*, 81 W. Va. 795, decided at the present term of the court, point 7 of the syllabus.

Our conclusion is to reverse the judgment, reinstate the verdict and to pronounce the judgment thereon in favor of plaintiff which we think the trial court should have given, with costs in this court and also in the circuit court by him expended.

*Reversed; verdict and judgment for plaintiff.*