# CHARLESTON.

MARY R. HARNESS, *Adm'x.* v. BALTIMORE & OHIO RAILROAD COMPANY *et al.*

Submitted April 14, 1920.   Decided April 27, 1920.

1.  MASTER AND SERVANT—*Under Federal Act Negligence Cannot be Presumed.*

    Under the federal Employers' Liability Act the negligence of a defendant railroad company cannot be presumed, but must be established affirmatively by the plaintiff. (p. 289).

2   COURTS—*Under Federal Act, Federal Court Decisions Control Negligence as Question for Jury and Applicability of Assumption of Risk.*

    In a proceeding instituted under that act, questions relating to the sufficiency of evidence of negligence to require submission of the case to the jury, and the applicability of the defense of assumption of risk, must be determined by appropriate common law principles, as interpreted and applied by federal courts. (p. 289).

3.  MASTER AND SERVANT—*Railroad's Negligence as to Employees Boarding Moving Trains Held Question for Jury.*

    Where there is evidence to show the long continued existence of a custom or usage among railroad employees at a definite

point on its line to board and ride moving freight trains to a neighboring town, and that the practice was of such notoriety and continuity that defendant's managing agents and officers must have known of it, and there is in evidence no rule or order of the company prohibiting its employees from using such means of transportation, and reasonably enforced, the questions whether the defendant owed the duty to use due care in the operation of its trains through such station so as to avoid unreasonable or extraordinary risks which might endanger the life and safety of an employee lawfully on its property at that point and bent on mounting the train in accordance with the recognized custom, and whether, if such duty existed, it was breached by a sudden jerk or bump which threw such employee under the train as he was in the act of boarding it, are for jury determination.   (p. 290).

4.   SAME—*Railroad Employe's Right to Board Moving Train According to Custom Held Question for Jury.*

Where there is evidence to show that such employee, though not actively engaged at work at the point on defendant's line where the injury occurred, was acting under the positive instructions of his superior officers to return home from his work in another town "on the first thing we could get in on," and had come to such intermediate station on a helper engine expecting to continue the journey home on the first yard engine, freight or passenger train going in that direction, the question whether he was lawfully on defendant's property at that intermediate point so as to avail himself of the custom above mentioned, or should have remained at the station where he was relieved from active duty and where he could have boarded standing trains instead of moving trains, as was generally necessary at the intermediate point, is also one for jury determination.   (p. 290).

5.   SAME—*Federal Act Abolishes Assumption of Risk Only Where Carrier Violates the Law.*

The Employers' Liability Act does not abolish the defense of assumption of risk except in cases involving violation by the carrier of a federal statute enacted for the safety of employees.   In all other respects the doctrine applies as at common law.   (p. 290).

6.   SAME—*Assumption of Risk Defined.*

An employee assumes those risks and dangers which are ordinarily incident to the employment in which he voluntarily engages, but he does not assume extraordinary risks incident

86 W. Va.

thereto, or risks due to the negligence of his employer or of those for whose conduct the employer is responsible, until he becomes aware of such negligent act, defect or disrepair, and of the risk arising therefrom, or unless the danger is so obvious that an ordinarily prudent person, under similar circumstances, would have observed and appreciated it. (p. 292).

7. SAME—*When Employe May Assume Proper Care as to Reasonably Safe Place and Methods for Work.*

Where an employee is without knowledge of such unusual risks, and not chargeable with notice thereof because of their obvious nature, he is under no duty to anticipate and take precautions to discover them, but has the right to assume that the employer has exercised proper care in providing a reasonably safe place and a reasonably safe system or method in and under which to work. (p. 292).

8. SAME—*Employe Riding on Freight Train Does Not Assume Risk of Extraordinary Jerks, and What is Extraordinary is for the Jury.*

An employee lawfully boarding a freight train at a proper place has the right to assume that he will not be subjected to jerks of extraordinary violence, where they are so sudden, unexpected and unusual as not to be obvious; and whether a particular jerk is one ordinarily accompanying the movement of freight trains, or extraordinary and unusual, generally is a question for the jury to determine. (p. 295).

9. CHAMPERTY AND MAINTENANCE—*Stranger to Alleged Champertous Contract Cannot Take Advantage of it.*

It is error to admit testimony introduced by defendant respecting the alleged champertous nature of the contract of employment between plaintiff and his attorney. Strangers to such a contract cannot take advantage of it; only a party can do so. (p. 295).

Error to Circuit Court, Mineral County.

Action by Mary R. Harness, administratrix, against the Baltimore & Ohio Railroad Company and Walker D. Hines, Director General of Railroads. Defendant railroad dismissed on its plea and motion and judgment for defendant. Hines on a directed verdict, and plaintiff brings error.

*Reversed and remanded.*

*Harry G. Fisher,* for plaintiff in error.

*Emory Tyler* and *Wm. G. Conley,* for defendant in error.

LYNCH, JUDGE:

To recover damages for the death of her husband, Charles E. Harness, caused, according to the averment of the declaration, by the negligence of the defendants, Baltimore & Ohio Railroad Company and Walker D. Hines, Director General of Railroads, the plaintiff, widow and administratrix of decedent, brought this action, and at the trial the jury at the direction of the court found for the defendant Hines, the railroad company having, in the meantime, been dismissed from the action on its plea and motion. Plaintiff has brought the case here for review, and has assigned numerous errors, many of which need only passing notice because of their incidental and inconclusive character. The only important and decisive matter is involved in the solution of the question whether the evidence introduced at the trial was of such character and effect as required submission to the usual triers of fact in cases of this sort without judicial interference.

The duty assigned to the deceased and his colaborers, O. L. and O. B. Boseley, brothers, and C. J. Hollen, was the inspection of Baltimore & Ohio freight cars at Bond, Maryland, about eight miles west of Piedmont where Harness was killed, and twelve miles west of Keyser where he, the Boseleys and Hollen resided, Piedmont and Keyser being in West Virginia. On account of the lack of suitable or any accommodations at Bond it was necessary for each of the employees to go daily from Keyser to Bond and return in the performance of the inspection work required of them, and to meet this situation and facilitate the work defendants, acting through their agents and employees, especially Burke, foreman of inspectors, provided free transportation for them over the company's railroad, no train being specifically designated for that purpose. The service so assigned and performed covered, it seems, for the most part evening and night employment, owing probably to the exigencies of personal and freight transportation during the war period, within which Harness received the injury instantly resulting in his death.

The passenger trains available for use and frequently used by the inspectors were the west-bound accommodation train, which when on time passed through Keyser about midafternoon, and

the east-bound accommodation due to arrive at Keyser at 11:11 o'clock, A. M., daily except Sundays. About half the time, however, the inspectors made the return trip from Bond on freight trains, and occasionally, the evidence shows not to exceed four times, rode to Piedmont on a helper engine and thence to Keyser by yard engine, freight or passenger train, whichever was most available. (Record pp. 46, 73). Evidence was offered, but refused, which, if introduced, would have proved or tended to prove the use by them of the Western Maryland Railroad train to complete the journey from Piedmont to Keyser on one of these occasions.

As the time of these employees necessarily covered the hours between the departure from and return to Keyser, that is, from midafternoon of one day till eleven o'clock the following morning, if they used the accommodation train and it was on time, and frequently it was not, the wages earned by them and paid exceeded what other employees serving defendants a fewer number of hours earned and received, and naturally enough caused complaint, not only by such other employees, but it seems also by officials of defendants. And as important in its bearing upon the merits of the case, the result of the dissatisfaction was an order or direction by Burke, in whose department and under whose control the inspectors worked, addressed to them personally, "to return on anything we could and get in as quick as we could," or, as some of the witnesses say, "to come in on the first thing we could get in on." Manifestly, this unqualified direction, if not an express command, inspired by defendants' superior officials, induced the inspectors to act with increased diligence in order to minimize the hours of service as far as possible under the circumstances, and in order to do so they rode from Bond to Keyser on freights about half the time instead of waiting for the east-bound passenger train. On the day on which Harness was killed they came on the helper engine as far as Piedmont, and as the duty assigned to the helper required it to aid the next west-bound freight to ascend the seventeen-mile grade, as it is known, westward from Piedmont, they could not reach Keyser by that engine, a fact known to them when they began their return, but endeavored to complete the trip by the

next east-bound freight, which they ascertained upon inquiry of the tower operator would leave in fifty minutes and reach Keyser before the east-bound morning accommodation would and did on that day. They therefore remained at Piedmont until the arrival of the freight and attempted to mount it while running through the railroad yards at the rate of about ten miles an hour, without stopping or intending to stop, as it was a through train. In this attempt the Boseleys and Hollen succeeded, but Harness failed and fell under it and most of the cars composing it passed over his body.

Though there is conflict in the evidence as to the real cause of the failure of Harness to mount the train successfully, the jury properly could have found, if permitted to determine the question without court direction, that the failure was due to a sudden forward movement creating a severe and unanticipated jerk, as witnesses speak of it, of the engine and therefore of the whole train, accelerated materially by the eastward down grade of the track at that point. Apparently no question was raised as to the interstate character of decedent's employment, nor can there be any in view of our decision in *Dumphy* v. *N. & W. Ry. Co.*, 82 W. Va. 123. Decedent's time, pay and service began and terminated at Keyser, and, though relieved from active duty for the day, he remained an employee within the meaning of the federal Employers' Liability Act while attempting to board the train for the purpose of returning to Keyser to complete his day's service.

In determining the correctness of the lower court's ruling in directing a verdict for defendant two questions arise: (1) Whether plaintiff has established a prima facie case of negligence sufficient to go to the jury; (2) if so, whether decedent assumed the risk of such negligence. Under the federal Employers' Liability Act the negligence of a defendant cannot be presumed, but must be established affirmatively by the plaintiff. *Culp* v. *Virginian Ry. Co.*, 77 W. Va. 125; *Hull* v. *Virginian Ry. Co.*, 78 W. Va. 25; *New Orleans etc. R. Co.* v. *Harris*, 247 U. S. 367; *New Orleans etc. R. Co.* v. *Scarlet*, 249 U. S. 528; *Yazoo etc. R. Co.* v. *Mullins*, 249 U. S. 531. And in a proceeding instituted under that act, questions relating to the sufficiency of evidence of negligence to require submission of the

case to the jury, and the applicability of the defense of assumption of risk, must be determined by appropriate common law principles as interpreted and applied by federal courts. *Southern Ry. Co.* v. *Gray,* 241 U. S. 333; *Union Pac. R. Co.* v. *Huxoll,* 245 U. S. 535; 1 Roberts Federal Liabilities of Carriers, §§ 542, 557.

The specific direction "to come in on the first thing we could get in on" may have induced decedent and his co-inspectors to believe that they were required to abandon the trains theretofore used by them on the return trip from Bond to Keyser after the day's work was completed, and if they were late to expedite the return by any other available mode of travel for that purpose. There were such means of transportation afforded by freight trains used both before and after Burke communicated to plaintiff's intestate and his associates the desire for diminution of the hours devoted to defendant's service. What else could he have meant; what other facility did the railroad company provide to accomplish that result? The duty to furnish some competent mode of transportation devolved upon the defendants, not upon the inspectors. The duty of the latter was to obey as far as possible by resorting to any feasible plan of locomotion to aid them, within proper limitations, in doing the thing required of them by their superiors. They had, as we have said, frequently made the return trip on freight trains before and after the complaint based on the excess of wages was made and before they received the orders from Burke, and therefore could continue to do so with perfect propriety after such orders.

But defendant insists that, even if the order given by Burke did authorize and direct them to ride on freight as well as passenger trains when the former were more available for a quick return, yet the direction contemplated that they should board such freights at Bond where all such trains stopped, where the inspectors were relieved from active duty, and where they could board the trains while standing and were not under the necessity of getting on moving cars as at Piedmont. The form of the instruction, however, did not so limit them, but consisted merely of the general direction for a speedy return. Was it an unreasonable construction of that order or a departure from

their duty to proceed by helper engine from Bond to Piedmont, an intermediate point four miles distant from Keyser, as they did on four occasions including the one in question, and thence get to Keyser by whatever means was most available, whether yard engine, freight or passenger train? We cannot so construe it as a matter of law. That is a question for the jury to determine from a consideration of all the facts. The fact that they devoted the fifty-minute wait in Piedmont, till the freight came, to shopping has no material bearing upon the propriety of their return home by that route, nor does it change the character of their employment from interstate to intrastate.

But assuming that the jury could properly have found that the inspectors were not unreasonable in proceeding to Piedmont, and that they were within their lawful rights in boarding a train at that point, did defendant owe them a duty to run its freight train through the station in such a manner as to eliminate extraordinary jerks or bumps such as the one may have been which caused decedent's death? There seems to be but little question that they did not signal the train to slow down or indicate that they were about to board it. Neither the engineer nor the fireman saw them standing on the platform, nor did they have instructions to stop or run slow in order to permit them or others to board it. In this last respect the case is substantially weaker than the Dumphy Case (82 W. Va. 123) where the engineer had an order to stop or slow down to permit plaintiff to board the train, but forgot to do so. Here there were no such orders and no actual notice that decedent and his associates would attempt to come aboard.

The plaintiff, however, offered to establish by a number of witnesses a custom, habit or usage of employees of the railroad company in getting on and off of freight trains in Piedmont under the same or similar conditions in going to and returning from Keyser. This testimony the court upon the objection of the defendant refused to permit, except once not in the presence of the jury, but in each instance counsel representing plaintiff stated on the record what the answer would have been if given, and which, if allowed, would have shown the long continued existence of such usage or custom, and that it was of such notoriety and continuity that defendants' managing agents and offi-

cers must have known of the practice. The testimony should have gone to the jury to be considered by it in connection with other facts proved, for in view of that custom it cannot be said as matter of law that defendant owed no duty to exercise due care towards those who might lawfully undertake to board the train at that point. There is in evidence no rule or order of the company prohibiting its employees from using such means of transportation between Piedmont and Keyser. If the evidence tendered but refused sustains plaintiff's statement of its contents, the custom was of such notoriety that defendants' officers and agents must have known of it. When it was reasonable to expect men to attempt to board moving freights at that point, we cannot say as a matter of law that defendant did not owe the duty to use due care to avoid unreasonable or extraordinary risks which might endanger the life and safety of an employee lawfully on its property at that point and bent on mounting the train in accordance with a general and long standing custom. *Simpson* v. *Carter Coal Co.,* 79 W. Va. 365. Whether such a duty existed under the circumstances and whether it was breached by the jerk or bump which threw Harness under the train were questions for jury determination, and it was error not to permit it to pass upon them.

With respect to the second question, defendant properly invoked in its behalf the defense of assumption of risk. The Employers' Liability Act does not abolish it as a defense except in cases involving violation by the carrier of a federal statute enacted for the safety of employees. In all other respects the doctrine applies as at common law. *Hull* v. *Virginian Ry. Co.,* 78 W. Va. 25; *Seaboard Air Line Ry. Co.* v. *Horton,* 233 U. S. 492; *Jacobs* v. *Southern Ry. Co.,* 241 U. S. 229; *Boldt* v. *Pennsylvania R. Co.,* 245 U. S. 441; *Chicago etc. Ry. Co.* v. *Ward,* 252 U. S. 18, 40 Su. Ct. 275. Although the availability of the defense of assumption of risk in actions such as this is everywhere recognized, it is sometimes difficult to determine whether the particular act or omission causing the injury was one of the risks assumed by the injured employee. Because of the importance of the problem and its applicability to the facts of this case, we give a somewhat extended review of recent federal cases discussing it and decisive here.

In *Gila Valley etc. Ry. Co.* v. *Hall,* 232 U. S. 94, the injury was caused by a defective wheel of a railroad "velocipede" used by the plaintiff at the time of the accident. In discussing the general rules applicable to such defects the court says that an employee assumes risk of dangers "normally incident to the occupation," and in addition risks arising from defective appliances due to the employer's negligence which the former knows endanger his safety or which create a danger "so obvious that an ordinary prudent person under the circumstances would have appreciated it." (pages 101, 102).

Likewise in *Seaboard Air Line Ry. Co.* v. *Horton,* 233 U. S. 492, a case dealing with the negligent failure to provide a glass guard to protect the engineer against the bursting of the water gauge, the holding is that an employee assumes risk of dangers "normally and necessarily incident to the occupation," and such others not naturally incident thereto "as arise out of the failure of the employer to exercise due care with respect to providing a safe place of work and suitable and safe appliances for the work," provided the former "becomes aware of the defect or disrepair and of the risk arising from it, unless defect and risk alike are so obvious that an ordinarily prudent person under the circumstances would have observed and appreciated them." (p. 504).

In *Jacobs* v. *Southern Ry. Co.,* 241 U. S. 229, a pile of cinders negligently permitted to remain by the side of the track caused an employee to trip as he attempted to board a moving engine with a bucket of water in his hand. In affirming a judgment for defendant the court said: "It would be going very far to say that a fireman of an engine who knew of the custom of depositing cinders between the tracks, knew of their existence, and who attempted to mount an engine with a vessel of water holding 'not over a gallon' could be considered as not having appreciated the danger and assumed the risk of the situation because he had forgotten their existence at the time and did not notice them." (p. 236).

In *C. & O. Ry. Co.* v. *De Atley,* 241 U. S. 310, a brakeman left the engine at the order of the engineer to obtain information at the tower relative to the operation of the train, and upon his return fell in the attempt to board the moving engine, the engi-

neer having knowledge of his intention to remount it. In holding the question of assumption of risk one for jury determination upon proper instructions, the court said: "Plaintiff, having voluntarily entered into an employment that required him on proper occasion to board a moving train, assumed the risk of injury normally incident to that operation, other than such as might arise from the failure of the locomotive engineer to operate the train with due care to maintain a moderate rate of speed in order to enable plaintiff to board it without undue peril to himself. But plaintiff had the right to presume that the engineer would exercise reasonable care for his safety, and cannot be held to have assumed the risk attributable to the operation of the train at an unusually high and dangerous rate of speed, until made aware of the danger, unless the speed and the consequent danger were so obvious that an ordinarily careful person in his situation would have observed the one and appreciated the other." (p. 314). It was contended by the railroad company that plaintiff ought to have known and comprehended, or should have anticipated and taken precautions to discover the danger attendant upon boarding a train moving at such speed. But in that connection the court said: "This is inconsistent with the rule repeatedly laid down and uniformly adhered to by this court. According to our decisions the settled rule is, not that it is the duty of an employee to exercise care to discover extraordinary dangers that may arise from the negligence of the employer or of those for whose conduct the employer is responsible, but that the employee may assume that the employer or his agents have exercised proper care with respect to his safety until notified to the contrary, unless the want of care and the danger arising from it are so obvious that an ordinary careful person, under the circumstances, would observe and appreciate them." (p. 315).

The latest extensive statement of the rule by the United States Supreme Court, so far as we have discovered, is found in *C. & O. Ry. Co.* v. *Proffitt,* 241 U. S. 462. There a brakeman was injured while engaged in switching operations at one end of a train of cars when a second switching crew working at the other end of the train drove a cut of twenty-nine cars into it with undue violence. There was evidence of a custom at that place to work

both ends of a train in that manner, but none to show that plaintiff had knowledge of the practice. The court said: "If it was an unusual or extraordinary danger, plaintiff could not be held to have assumed it, in the absence of knowledge or notice on his part. To subject an employee without warning to unusual dangers not normally incident to the employment is itself an act of negligence. And, as has been laid down in repeated decisions of this court, while an employee assumes the risks and dangers ordinarily incident to the employment in which he voluntarily engages, so far as these are not attributable to the negligence of the employer or of those for whose conduct the employer is responsible, the employee has the right to assume that the employer has exercised proper care with respect to providing a reasonably safe place of work (and this includes care in establishing a reasonably safe system or method of work), and is not to be treated as assuming a risk that is attributable to the employer's negligence until he becomes aware of it, or it is so plainly observable that he must be presumed to have known of it. The employee is not obliged to exercise care to discover dangers not ordinarily incident to the employment, but which result from the employer's negligence." (p. 468). See also *Erie R. Co.* v. *Purucker,* 244 U. S. 320.

The converse of the Proffitt case appears in *Boldt* v. *Pennsylvania R. Co.,* 245 U. S. 440, which shows the different result reached by the court when the employee knew of the extraordinary danger or it was so obvious that a reasonable person would have appreciated it. While between cars in a freight yard helping to repair a faulty coupler, a yard conductor was killed, due to the impact of a string of cars, moving by gravity under the control of a brakeman, against the end of the train on which deceased was working. There was evidence to show that the cars came at a negligent speed, and also showing a custom, considered good railroading, to send down cars in "strings" and allow them to strike others with sufficient force to secure coupling. In addition decedent was violating instructions in standing between the cars. Here the risk or danger, though extraordinary in its nature, was known to decedent or was so obvious that an ordinarily prudent person would have appreciated it. The court said that a servant "assumes extraordinary risks incident to his

employment, or risk caused by the master's negligence, which are obvious or fully known and appreciated by him."

As disclosed by the decisions and excerpts quoted above, the rule sanctioned by the Supreme Court of the United States appears to be: An employee assumes those risks and dangers which are ordinarily incident to the employment in which he voluntarily engages, but he does not assume extraordinary risks incident thereto, or risks due to the negligence of his employer or of those for whose conduct the employer is responsible, until he becomes aware of such negligent act, defect or disrepair, and of the risk arising from them, or unless the danger is so obvious that an ordinarily prudent person, under similar circumstances, would have observed and appreciated it. Where an employee is without knowledge of such unusual risks, and not chargeable with notice thereof because of their obvious nature, he is under no duty to anticipate and take precautions to discover them, but has the right to assume that the employer has exercised proper care in providing a reasonably safe place and a reasonably safe system or method in and under which to work. Such also is the rule adopted and followed by this court in *Dumphy* v. *N. & W. Ry Co.,* 82 W. Va. 123, and *Keathley* v. *C. & O. Ry Co.,* 85 W. Va. 733, 102 S. E. 244. And see 1 Roberts Federal Liabilities of Carriers, § 558

Applying these principles to the facts shown by the evidence, it was for the jury to determine whether the risk of the fall which resulted in decedent's death was an ordinary one assumed by him when he attempted to board the moving train, or an extraordinary one caused by the negligent operation thereof. That the movement of a freight train generally is accompanied by jerks of greater or less severity is a matter of common observation and knowledge, but an employee lawfully boarding such train at a proper place has the right to assume that he will not be subjected to extraordinary or unusual jerks. Risks of the latter sort ordinarily are not assumed by him, being usually so sudden as not to be obvious. *Chicago etc. Ry Co.* v. *Ward,* 252 U S. 18, 40 Sup. Ct., 275; *Keathley* v *C. & O. Ry. Co., supra.* See also *Jones* v. *Norfolk Southern R. Co.,* 176 N. C. 260; *Weldon* v. *Seaboard Air Line Ry. Co.,* 177 N. C. 179. On the other hand, O. L. Boseley, a witness for plaintiff and one of

the inspectors who accompanied decedent on the day of his death, admitted that they had no "reason to suspect that the train would slow up or make any special effort to do so"; that they had no orders to ride on "any particular freight train"; and that they "did not expect them (the train crew) to give any special consideration to them in the movement of that train at the time" they intended to get on it. And O. B. Boseley, who likewise had accompanied decedent, admitted that he had seen freight trains pick up speed going through Piedmont. Whether, in view of all these facts, there was an assumption of this particular risk was for the jury to determine.

We are not concerned upon this hearing with the defense of contributory negligence, for it is no longer an absolute bar under the act, but is admissible only in mitigation of damages. It was error to admit the testimony respecting the alleged champertous nature of the contract between plaintiff and her attorney. Strangers to such a contract cannot take advantage of it; only a party to it can do so. *Harrison* v. *Harman* 85 W. Va. 538 102 S. E. 224.

It is unnecessary to consider or express an opinion upon the propriety of the ruling upon the plea and motion, sustained, to dismiss the defendant Baltimore & Ohio Railroad Company as a party to the action, whether erroneous or not, owing to the provisions of sub-section (d) of section 206, ch. ——, of the act of Congress passed February 28, 1920, terminating federal control over railroads, arranged, classified and found in the Advance Sheets of volume 262 Federal Reporter at page 339. The subdivision reads: "Actions, suits, proceedings, and reparation claims, of the character above described, pending at the termination of federal control shall not abate by reason of such termination, but may be prosecuted to final judgment, substituting the agent designated by the President under subdivision (a)"; payment of the recovery, if any, being chargeable to and payable promptly out of the revolving fund created by section 210 of the act. Having in view this provision, plaintiff immediately preceding the submission of the case for hearing by this court moved, without objection by the Director General, to substitute the agent appointed by the President as so authorized, presumably Hines himself. This motion our order will sustain and

direct the circuit court to ascertain the name of the appointee, and substitute him as defendant in the action.

Therefore we reverse the judgment of the lower court and remand the case for new trial.

*Reversed and remanded.*