# CHARLESTON.

GOSHORN v. WHEELING MOLD & FOUNDRY CO.

Submitted June 6, 1908. Decided March 2, 1909.

1. MASTER AND SERVANT.—*Fellow Servant—Who Are.*

A servant employed to operate, in the night time, a particular machine, is not a fellow servant with a machinist employed to keep the machinery in the plant in good order and condition, nor with other servants employed therein to operate the same machine in the day time, who on request may have assisted such machinist in installing a new pulley connected with such machine, and which as observed by them is cracked and rendered defective and unsafe in the installation thereof, so as to absolve the master from liability for injuries resulting to such first servant therefrom. (p. 255.)

2. SAME—*Contributory Negligence—Knowledge of Defect—Imputed Knowledge.*

The knowledge of the servants, employed on such day shift, can not be imputed to the servant employed on said night shift, or render him guilty of negligence in continuing in his employment, unless he had knowledge of such defective and unsafe machinery, or it was so plainly manifest that he ought to have known it. (p. 256.)

65 W. Va.

3.  SAME—*Injuries to Servant—Safe Appliances—Delegation of Duty—Fellow Servant.*

A case in which the principles announced in *Madden* v. *Railway Co.*, 28 W. Va. 610; *Jackson* v. *Railway Co.*, 43 W. Va. 380; *Vickers* v. *Kanawha & W. V. R. Co.*, 63 S. E. 367 and *Richards* v. *Iron Works*, 56 W. Va. 510, relating to the non-assignable duties of a master, are properly applied as controlling the facts in the case, and the instructions to the jury, given and refused. (p. 257.)

4.  SAME—*Risks Assumed by Servant—Knowledge of Defect.*

A servant has the right to presume that the master has provided him a reasonably safe place to work, and it is only after discovering the place to be unsafe that he can be said to have assumed the extra risk of continuing in his employment; and though after reasonable time allowed him he will be presumed to be aware of and have knowledge of apparent defects, yet to charge him with notice thereof on this ground, such defects and dangers must be unquestionably plain and obvious, so that if he did not see them he must necessarily be in fault. (p. 258.)

5.  SAME—*Injuries to Servant—Actions—Questions for Jury.*

Generally, whether the continuance in the service and the use of defective machinery amounts to such negligence as to bar recovery, ought to be submitted to the jury under proper instructions from the court. (p. 258.)

6.  NEW TRIAL—*Newly Discovered Evidence—"Cumulative Evidence."*

Newly discovered evidence of an admission of the same kind and to the same point as that given in evidence on the trial by a witness examined, though made to another and different person, and at a different time and place, and under different circumstances, is cumulative in character and will not be good ground for setting aside a verdict and awarding a new trial. (pp. 261, 262.)

7.  APPEAL AND ERROR—*Review—Amount of Verdict.*

In an action by a servant against a master, for personal injuries sustained, there is no fixed rule of compensation, as in actions for death by wrongful act, and unless the verdict of the jury is for an amount so out of proportion to the actual injury as to evince the fact that the jury has been misled, or been influenced by corruption, passion or prejudice it will not be set aside. (p. 262.)

Error to Circuit Court, Ohio County.

Action by Frank Goshorn against the Wheeling Mold & Foundry Company. Judgment for plaintiff, and defendant brings error.

*Affirmed.*

RUSSELL & RUSSELL, for plaintiff in error.

O'BRIEN & O'BRIEN and S. O. BOYCE, for defendant in error.

MILLER, PRESIDENT:

The plaintiff, a machinist of some eighteen years experience, employed by defendant in its foundry at Wheeling on a night shift, in some way had his right arm caught between a belt and pulley on the shafting attached to the machine he was operating, resulting in a severance of his lower fore arm, and so mangling and bruising his upper arm that it had to be amputated above the elbow. For his injuries thus sustained he recovered in the court below a verdict and judgment against defendant for $16,777.75. The circuit court denied the defendant's motion for a new trial, and the case is now before us upon writ of error.

The circumstances surrounding plaintiff at the time of his accident as summarized by defendant's counsel are as follows: The machine at which he was working was an end milling machine, used for grinding the ends of iron and steel castings. The grinding wheel in front of which plaintiff worked, and toward which on tables he placed the castings to be ground, was turned rapidly by a shaft. When standing fronting this wheel, there were to his left along the same shaft three other wheels, or pulleys. The first pulley was the one in connection with which the accident occurred. It was made of metal, about eight inches in diameter, the shaft running through its centre, and from the centre spokes ran out to the rim, about six inches in width and an eighth or a quarter of an inch in thickness, except where the spokes joined it and where it was thicker than at the sides. The belt running around this particular pulley was in a vertical position running around another much larger pulley, immediately over and several feet above the one at which the accident occurred. On the same shaft, and to the left of the latter pulley, were two other pulleys, side by side, on which ran belts of considerable length, in a horizontal position and running to other pulleys some distance away. All of these pulleys and belts ran at a very high speed. As much oil was used in connection with the machinery, and some of it would occasionally get upon the belts causing them to slip when working against

the pulleys, it was necessary from time to time to throw powdered chalk upon the inside portion of the belts to take up the oil. The two pulleys west of the pulley at which the accident occurred had in front of them a metal shield fastened by a screw to a portion of the structure just above these pulleys.

The negligence charged, and on which the plaintiff bases his right of recovery, is in the first count, that defendant did not use proper care and caution that he was provided with good, proper, safe and suitable machines and appliances, in that it provided for and suffered to be used by him, while engaged in operating said "end milling machines" a cracked, insecure, weak, unsafe and unsuitable pulley, located at the lower left corner of said machines, because of which said pulley broke and parted and a portion thereof struck plaintiff on the head with great force and violence, whereby he became dazed and thrown down and his right arm was caught in said pulley and belting and was torn and cut off, necessitating amputation as aforesaid; and in the second count, in addition to what is charged in the first, it is alleged to have been a part of the duty of plaintiff in operating said machine to chalk the belts and pulleys, and, in addition to the other duties of the defendant charged in the first count, that it was especially its duty to provide plaintiff good, safe, proper and suitable belting and pulleys to be used by him aforesaid; but disregarding its duty in this behalf, defendant had provided and suffered to be used by the plaintiff a certain unsafe and unsuitable belting, and that while he was engaged in performing his duty of chalking said belting and pulleys, and operating said machine said pulley broke and parted and a portion thereof struck the plaintiff on the head with great force and violence whereby he became dazed and was thrown down and injured as described in the first count.

On the trial plaintiff relied entirely upon proof of the cracked, weak and insecure condition of the pulley at which the accident occurred, and of which he testified he had no previous knowledge or information; and on the further evidence of himself and his witnesses, showing and tending to show that while engaged in chalking the belts as charged the pulley broke and parted, a portion thereof striking him, and causing him to fall and his arm to be caught and injured as alleged.

Although defendant controverted the fact that the pulley was

in a cracked and insecure condition, its evidence on this question was negative and circumstantial only, and it relied mainly on the theories that plaintiff had negligently contributed to his injuries, first by selecting the wrong place to chalk the horizontal belts; second, that in attempting to apply the chalk he had thrust his hand over the pulley and between the sides of the belt in which his arm was caught and severed, and third, that it was because of the place at which and the negligent manner in which he had undertaken to chalk the belts that his sleeve had been caught between the revolving pulley and belts and severed in the manner described, and that the breaking and parting of the pulley was not the cause of plaintiff's injuries, but the result of his arm being caught as described.

It is claimed for defendant that the safe and proper way to chalk the belts was to take off the metal shield referred to and throw the chalk on the lower inside portion of each belt by throwing it through the space between them; that the plaintiff instead of doing the chalking in the safe way had preferred the dangerous method of throwing the chalk over the pulley at which the accident occurred, between the two portions of the belt running around that pulley, and had thus, by his negligence contributed to his injuries. The evidence, however, of a number of witnesses who worked at this machine, is that the chalking of the horizontal belts was always done from the position occupied by the plaintiff; and there was much evidence tending to show that this was as safe a place as the other, and took less time and in some respects was less dangerous than to do the chalking from the other position.

On these controverted and material facts the defendant submitted to the jury three special interrogatories, which were answered and returned by them with their verdict, as follows: Number one, "Was the pulley, which according to the plaintiff's claim broke and caused the injury to the plaintiff, cracked or in improper condition at the time when it was put into place some weeks or more before the accident?" Answer "Yes:" number two, "Was the plaintiff guilty of negligence directly contributing to his injury in the manner in which he acted in chalking the belts just before and at the time when the accident occurred?" Answer "No:" number three, "Did the pulley break before the plaintiff's arm was caught?" Answer "Yes." We must therefore

treat these findings of facts by the jury, as well as all other findings of facts controverted, and necessarily involved in their general verdict, as conclusive thereof.

But questions of law are presented: First, it is said that the negligence complained of, if any, was that of Bitner, the machinist, and of Pearl and Hill his assistants, fellow servants of plaintiff; that Pearl and Hill who operated, on the day shift, the same machine, especially were such fellow servants; and that as they assisted Bitner in putting on the pulley, and knew of the cracked and dangerous condition in which it was left, and had called Bitner's attention to it, their negligence cannot be imputed to the master. While the evidence is that Pearl and Hill assisted Bitner in putting on the pulley it was no part of their duty to repair or keep the machinery in proper condition. They say they called Bitner's attention to the cracked condition of the pulley and that he replied that the defect was not material or important. It was his duty to look after the machinery and keep it in repair. As many times announced by this Court, there are certain non-assignable duties which a master owes to his servant. The first of these, as announced in *Madden* v. *Railway Co.,* 28 W. Va. 610, and repeated in *Jackson* v. *Norfolk & W. R. Co.,* 43 W. Va. 380, 382, is "To provide safe and suitable machinery and appliances for the business. This includes the exercise of reasonable care in furnishing such appliances, and the exercise of like care in keeping the same in repair and making proper inspections and tests." And it is there said that all of these duties are included in the one general duty of the master to provide a safe plant. And at page 383, it is said, "These duties are sometimes spoken of as duties in construction, preparation and preservation, as contrasted with mere work of operation." And the first point of the syllabus is: "The test whether a master is liable to one servant for the negligence of another servant is the character of a negligent act. If it be in the doing of an act incumbent on the master as a duty of the master to the servant, the master is liable; otherwise not." See also *Vickers* v. *Kanawha & W. V. R. Co.,* 64 W. Va. 474 (63 S. E. 367). These decisions, and many other decisions of this Court that might be cited, clearly show that it was one of the non-assignable duties of the defendant to keep the pulley in question, in a reasonably safe and proper condition, and that no matter to

whom delegated, or by whom performed the defendant is, nevertheless, liable for the negligent performance thereof. *Vickers* v. *Kanawha & W. V. R. Co., supra.* A fellow servant can be intrusted with the performance of such non-assignable duty but not so as to excuse the defendant from liability. This case is not within the rule of *Williams* v. *Thacker Coal & Coke Co.,* 44 W. Va. 599, as counsel for defendant argue. The holding in that case that a mine boss, employed in a coal mine, is a fellow servant with the miner employed therein, is predicated mainly upon the fact that the statute referred to properly construed makes him so. A safe plant or a reasonably safe place to work required the operator of a coal mine, respecting over hanging slate, as in *Williams* v. *Coal Co.,* and with respect to ventilation of the mine and other duties devolved upon a mine boss or a fire boss, as in *Squilache* v. *Tidewater Coal & Coke Co.,* 64 W. Va. 337 (62 S. E. 446), means, in the eye of the statute, that the mine shall be reasonably safe in the first instance. The cases just referred to, involving mining operations, and governed by statute, fall rather within the rule announced in *Jackson* v. *Norfolk & W. R. Co., supra,* at page 384, that "you can not make the master liable for an act of mere operation, no matter by what servant done. You cannot exempt him for an act not one of mere operation, but of his personal duty, though done by any servant."

Another proposition urged is, that plaintiff assumed all the risks incident to his employment arising from the nature and character of the machinery and its surroundings, including the danger of putting his hands, or arm, or head, or any part of his body over the pulley or between the portions of the vertical belt, according to the theory of the defendant. And the argument is that plaintiff must have had knowledge of the crack in the pulley, that it was cracked, and as the crack was visible, as shown in the evidence, that he ought to have been familiar with it, and knowledge thereof must be imputed to him; and that having undertaken to chalk the belts in the manner assumed by defendants, and having remained in the defendants employ with such knowledge, he must be regarded as having assumed all risks incident to his employment and incident to the conditions surrounding him, absolving the defendant from all liability for his injuries sustained. The plaintiff, however, denied all knowledge of the

defective condition of the pulley, and the evidence shows that it
was not so plainly visible that he could be charged with actual
knowledge thereof. Without such actual knowledge he had the
right to assume that defendant had discharged its full duty to
him in providing him a reasonably safe place to work. The jury
by their verdict necessarily found that he had no such actual
knowledge, and was not chargeable with actual knowledge of the
defective condition of the pulley, and there is no evidence show-
ing, or tending to show, that either Bitner or Pearl or Hill his
assistant, communicated to plaintiff their knowledge of the con-
dition of the pulley. Having positively denied knowledge thereof,
this case can not be brought within the rule of *Purkey* v.
*Southern Coal Co.,* 57 W. Va. 595; *Lafferty* v. *Hambrick,* 57 S.
E. 240; and *Williams* v. *Belmont Coal & Coke Co.,* 55 W. Va.
85, as argued by defendant's counsel, and we see no material dis-
tinction between the case at bar and the case of *Richards* v.
*Iron Works,* 56 W. Va. 510. It is said with respect to the latter
case that the negligence which resulted in the accident there
involved was not the negligence of any person with whom the
employee injured had been working in the same line of work,
as it is claimed was the fact in the case at bar. But as we have
seen the negligence of a fellow servant intrusted with the per-
formance of a non-assignable duty will not excuse the master
from liability for the negligent performance thereof. In the
*Richards case* the death of plaintiff's intestate was due to de-
fective material used in the building of a scaffold. Decedent did
not assist in handling the material for or aid in building the
scaffold, but he was as much a fellow servant with those who
did assist therein as the plaintiff here was a fellow servant with
Bitner or Pearl, or Hill and who assisted in installing the de-
fective pulley. In the *Richards case* the Court said of the
deceased: "He is not shown to have had any knowledge of its
unsound or unsafe condition. The part which gave way, and
precipitated him to the ground was a lookout, answering to a
joist, which was covered by and supported one end of the boards
of that platform. While the defendant contends that intestate
did not observe, but could have observed any defects in the
materials of the scaffold or in its workmanship, by the exercise
of ordinary care, this circumstance, connected with the fall of
the scaffold, seems to negative that presumption. We do not

think that plaintiff's intestate was bound, under the law, to make an examination of the scaffold, before going upon it to work." In the case at bar plaintiff was employed at night. Was he bound to make a critical examination of the pulley and other parts of his machine? We think not. In *Lafferty* v. *Hambrick, supra,* point two of the syllabus, makes it clear that a servant entering upon and continuing in service in an unsafe place, he does not waive the performance by the master of the duties imposed upon .him by law in respect to the safety of the place in which his service is performed, except where those dangers are known to and fully appreciated by him. According to *Purkey* v. *Coal Co., supra,* when the servant enters the master's employment he may presume that the master has provided a safe place for him to work, and it is only after discovering the place to be unsafe that he can be said to have assumed the extra risk of continuing in the employment. In *Norfolk etc. R. Co.* v. *Cheatwood,* 103 Va. 356, it is· said, a servant is not presumptively chargeable with notice of a peculiar and unusual state of things. A reasonable time must be allowed for him to learn of the change in the situation, and although he is presumed to be aware of defects which are perfectly obvious to his sight and the danger is apparent to any person of his mental capacity, nevertheless, to charge him of notice on this ground the defect and danger must be unquestionably plain and clear so that if he did not see it he must necessarily have been in fault. And in *Wheel Co.* v. *Harris,* 103 Va. 708, it is said: "Generally, whether the continuance in the service and the use of the defective machinery amounts to such negligence as to bar recovery, ought to be submitted to the jury under proper instructions from the court."

In the court below exceptions were saved by defendant to the giving of the six instructions propounded to the jury by plaintiff; but here the exceptions to the second, fourth and fifth instructions only are relied on. The second contains a statement of the general duty of the master to furnish a reasonably safe place to work, and the non-assignability of that duty; and if assigned, that the person to whom it is assigned, no matter what his grade or rank in the service of the master may be, becomes a vice principal. The criticism of this instruction is that it omits any reference to the crack in the pulley; that it is misleading in omitting any reference to the rule in *Lafferty* v.

*Hambrick, supra,* that though the place of labor may be unsafe if the servant knowing of the dangerous position, continues in the service, he assumes the risks incidental thereto; and also that it omits any reference to the fact that the negligence in installing the defective pulley was that of fellow servant of plaintiff. The fourth instruction propounded to the jury the proposition, that if the defendant suffered and permitted the pulley at which the plaintiff was injured from any cause to become unsound, unsafe, insecure, cracked and defective and that this condition was known to it, and that by the reasonable and ordinary care and diligence such condition would have become known to it, and that the injuries to plaintiff resulted therefrom, without fault on his part, while he was in the performance of his duty, defendant was liable, and the jury should find for the plaintiff. It is objected to this instruction, that it assumes the pulley referred to was cracked, dangerous and likely to bring about the accident.   We do not think it amenable to this criticism.   It does not assume the fact, but submits the question to the jury. It is said of it that if the pulley was in a cracked and dangerous condition the plaintiff had the same opportunity, by the exercise of like reasonable and ordinary care and diligence, to have learned, as easily and readily as the defendant might have done, of its condition, and that the plaintiff thereby assumed all the risk and danger incident to its condition, absolving the defendant from liability therefor.   And moreover that it limits to the company alone the duty to take notice of the defective condition of the pulley, and eliminates any such obligation on the part of the plaintiff, contrary, it is claimed, to the rule of *Williams* v. *Belmont C. & C. Co.,* and *Lafferty* v. *Hambrick, supra.*   It is also urged against the fifth instruction that it is also misleading in the same way and along the same lines as the fourth instruction.   It propounded to the jury the proposition that it is the positive duty of the master in all cases to inform the servant of any defects and dangers in the tools, machinery, and appliances, with which he is required to work and of which he has knowledge or ought to have knowledge by the exercise of reasonable attention, care and diligence but of which the servant is ignorant and would not discover by reasonable care on his part.   We are of opinion that all three of these instructions propounded correct propositions of law, and are in

accordance with principles enunciated in the decisions already referred to.

It is represented also that the court below erred in refusing defendants instruction number two, in the form presented; and in modifying it, and thereby materially changing its force and effect, as originally presented; and also in rejecting defendants instructions number eight and nine. As proposed, instruction number two was as follows: "In accepting and entering upon a position under the employment of another person or corporation the employee assumes any risk of injury which may result to him from the ordinary conditions and circumstances existing in the place where he is required to do his work." As modified by the court there was subjoined to it, "but he does not assume extraordinary risks, arising from the use of defective machinery, or by the use of reasonable care should have such knowledge, and then continues in the employment." We think the modification proper. As proposed it was too much restricted. And, as was said by the court below, "It might easily be construed as imposing upon the employee the assumption of the risk resulting from all ordinary conditions in the place where he works, including latent defects and dangers of which his employer is informed, or ought to be informed, and of which the employee is ignorant, provided only that such defects and dangers were part of the usual conditions in that particular place of employment," which would be contrary to the rule of law as announced in cases already cited. The eighth instruction, rejected, was, "If the jury find from the evidence that the accident and injury to the plaintiff were brought about through the negligent act of the other employe of the defendant who placed in its position the pulley which is claimed to have broken and thus caused the injury to the plaintiff, then the defendant is not responsible for any such negligence of such other employe and the jury should not find a verdict for the plaintiff because of such crack in such pulley and the breaking of such pulley by reason thereof." The ninth instruction, rejected, was a binding instruction, telling the jury, that "under the evidence as presented, it is their duty to find a verdict for the defendant." We agree with the court below that the eighth instruction was intended to and in effect would have told the jury, that Bitner was a fellow servant of Goshorn. Clearly this would have been error under the evidence.

The ninth and binding instruction was clearly not justified by the evidence. It would have taken from the jury the question of the negligence of the defendant, and whether or not the plaintiff was guilty of contributory negligence, questions of fact which under the evidence were clearly within the province of the jury, and not for the court.

The action of the court below in refusing a new trial is also assigned as error. This motion was based mainly upon two grounds: First, newly discovered evidence; and, second, that the verdict was excessive in amount. The newly discovered evidence relied upon was that defendant had 'discovered since the trial, that plaintiff had stated to Dr. Hildreth, at the City Hospital, between June 15th and 30th, 1905, that "he did not blame the company, but that his flowing sleeve had been caught between the belt and the pulley, and that was the way the accident happened, and that was his own fault." The evidence shows that Dr. Hildreth was the physician and surgeon employed by defendant to attend plaintiff at the hospital; that he was afterwards active in trying to secure a settlement between plaintiff and defendant; that he was not summoned or examined as a witness on the trial, and it is not shown by any affidavit or otherwise that defendant had made any inquiry of Dr. Hildreth about the supposed conversations between himself and the plaintiff in relation to the cause of plaintiff's injuries, or the manner in which they had been sustained, a most natural thing to have done owing to his professional employment by defendant. Besides, plaintiff in an affidavit filed upon the hearing of the motion for a new trial positively denied that he had ever had any such conversation with Dr. Hildreth. And while disclaiming any intention to impute falsehood to Dr. Hildreth, plaintiff further says, that in a conversation with Dr. Hildreth, in the month of April of that year, when he sustained an injury to a finger on his left hand he did state to Dr. Hildreth, that he did not blame the company for that injury; that it was due to his own fault. We think this evidence cumulative of the testimony of like character as that given by the witness Yertzell. Yertzell when on the stand at the trial stated that the plaintiff, about ten minutes after the accident occurred, had made a similar statement to him as to the manner in which he had sustained his injuries. The defendant failed to show on his motion for a

new trial that it had brought itself within any of the rules entitling it to a new trial for after discovered evidence, except only that this evidence had been discovered since the trial. It is argued that although this evidence of Dr. Hildreth is of the same character as that given by the witness Yertzell, yet as it relates to a declaration of plaintiff made at another and different time, and under different circumstances, it ought not to be regarded as cumulative. This is not the law. "Cumulative evidence," says Greenleaf, "is evidence of the same kind to the same point. Thus if a fact is admitted to be proved by the verbal admission of the party, evidence of another verbal admission of the same fact is cumulative." 2 Greenleaf on Ev., section 2. See also *Grogan* v. *C. & O. R. R. Co.,* 39 W. Va. 415; *Sisler* v. *Shaffer,* 43 W. Va. 769; *Stewart* v. *Doak,* 58 W. Va. 172. The motion based on newly discovered evidence therefore we think was properly overruled.

But what shall we say as to the amount of the verdict. This is a most serious question. It is conceded on both sides that the verdict is a large one. On behalf of the defendant it is claimed that it is so excessive as to clearly evidence the fact that the jurors were prejudiced against the defendant. So far as we have knowledge it is the largest verdict ever rendered by a jury in this state for like or similar injuries sustained. In brief of counsel for defendant it is compared to the verdict for $7,500.00, involved in *Thomas* v. *Electrical Co.,* 54 W. Va. 395, and in which this Court is quoted as saying: "For these reasons, with some reluctance as to the amount of the judgment, we affirm it." That was a suit by an administrator for the death of his intestate, due to the negligence of the defendant, our statute, in such cases, limiting recovery to $10,000.00. At common law such actions did not survive; and it is only by virtue of the statute, section 3488, Code 1906, that an action for death by wrongful act can be maintained. The statute imposes no limitations on the amount of recovery by the person injured. As was said by the learned judge in his opinion in the court below, quoting from *Trice* v. *C. & O. Ry. Co.,* 40 W. Va. 271: "In actions for personal injuries, and in cases generally where there is no fixed rule of compensation, the theory of the law is that the decision of the jury is conclusive, unless they have been misled, or their verdict has been influenced by corruption,

passion or prejudice. Unless the verdict finds an amount so out of proportion to the actual injury as to evince such misleading, or the presence of some malign influence, it will be sustained, although it may materially differ from the judgment of the court. But if the amount of the verdict so far exceeds or falls short of what to the court appears to be just compensations as to induce the belief that the jury have not given the case a fair and dispassionate consideration it will be set aside."

And as was said by the circuit judge: Plaintiff was a machinist of some eighteen years experience, and at the time of his injuries was thirty five years of age, in good physical health, capable of earning thirty cents per hour, working twelve hours a day. He had depending on him for support a wife and children, the evidence showing that since the loss of his arm, and after much effort, he had been unable to secure any employment. The jury were no doubt influenced, but properly so, by these and other facts and circumstances shown in the evidence.

In 6 Thompson on Negligence, 365 *et seq.,* this writer, in a valuable note, has collated many cases in which verdicts of this kind, some for larger and some for smaller amounts, and for like or similar injuries, have been sustained. It is unnecessary to do more than refer to the cases there cited for justification of the verdict in the case before us, certainly for our justification in not disturbing it because of the amount of it.

As the judge below who tried the case and had better opportunity than we to understand the facts, to observe the witnesses, the character of the jurors, and all the facts and circumstances on which the verdict depended, could not find that the verdict, had been influenced by corruption, passion or prejudice, neither can we. We can not invade or usurp the province of the jury, and substitute our own judgment for the judgment of the proper triers of the facts, and of the amount to which the plaintiff is entitled at their hands, by way of damages for his injuries. The law invests us with no such power. Our jurisdiction, particularly in cases of this kind, is limited to discovering bias, prejudice, fraud or corruption in the verdict.

Finding no error therein we must affirm the judgment.

*Affirmed.*