# CHARLESTON.

SIRRILDA LOONEY, *Administratrix, v.* NORFOLK & WESTERN
RAILWAY COMPANY

(No. 5583)

Submitted April 27, 1926.   Decided June 1, 1926.

(Rehearing Denied November 12, 1926.)

1.  INSTRUCTIONS—*If Instruction in Action for Wrongful Death
    Based on Federal Employers' Liability Act of Congress,
    Predicated on Conflicting Evidence Submits to Jury De-
    ceased's Knowledge and Appreciation of Assumption of
    Risk of Dangerous Instrumentality Which Caused Injury,
    Defendant is Deprived of no Right Based on Defense of
    Assumption of Risk.*

    In an action for wrongful death, based on the Federal
    Employers' Liability Act of Congress, if an instruction predi-
    cated on conflicting evidence properly submits to the jury the
    question of deceased's knowledge and appreciation, and his
    assumption of the risk, of a dangerous instrumentality which
    caused his injury and death, the defendant has been .de-
    prived of no right based on the defense of assumption of risk.
    (p. 43.)

2.  SAME—*Instruction Given at Instance of Plaintiff in Such·
    Action Based on Theory of Defendant's Neglect to Fur-
    nish Employee Reasonably Safe Place to Work Which
    Tells Jury That Sum Found for Pecuniary Damages and
    Damages for Conscious Pain and Suffering Should Not
    Exceed Amount Sued for Does Not Constitute Error.*

    An instruction to the jury in such an action given at the
    instance of plaintiff, based on evidence and the theory of de-
    fendant's neglect to furnish its employee a reasonable safe
    place to work, and which tells the jury that the sum found
    for the pecuniary damages and damages for conscious pain
    and suffering endured should not exceed the amount sued for,
    does not constitute reversible error.   (p. 44.)

3.  MASTER AND SERVANT—*Where Instrumentality Doing Injury
    Was a Car Retarder Installed on Coal Tipple Above Rail-
    way Track and Under Which Was so Low and Close to
    Passing Engines as Not to Furnish Safe Clearance But
    Until Deceased Was Injured no Engine Had Collided
    Therewith Nor Injury Resulted to Employees, and Though
    Deceased May Have Known of Existence of Retarder, It*

*Was a Question of Fact for Jury and Not One of Law for Court to Determine Whether Deceased Knew and Appreciated Dangers of Continuing in Employment and Assumed the Risks so as to Preclude Recovery.*

Where, as in this case, the instrumentality doing the injury consists of a car retarder installed upon a coal tipple above the railway tracks, and under which deceased and other enginemen were required to deliver coal cars to a collieries company, and which was so dangerously low and close to passing engines as not to furnish safe clearances to them, but until deceased was injured no engine was shown to have collided therewith nor injuries resulted to employees, and although deceased may have known of the existence of such car retarder, it was a question of fact for the jury and not one of law for the court, to determine whether, under all the facts and circumstances of his injuries, deceased knew and appreciated the dangers of continuing in his employment, and thereby assumed the risks thereof so as to preclude plaintiff's recovery. (p. 45.)

4.  SAME—*Employee of Railway Company Entering Upon His Employment Assumes All Ordinary Risks Thereof But Not Extraordinary Risks and Hazards to Which Negligence of Company Subjects Him and to Which he Has Right to Assume His Employer Will Not Expose Him, and May Act on This Assumption Unless Dangers Are so Open and Apparent as to Cause One of Ordinary Prudence to Appreciate Them.*

An employee of a railway company in entering upon his employment assumes all the ordinary risks thereof, but not the extraordinary risks and hazards to which the negligence of the railway company may from time to time subject him, and to which he has the right to assume his employer will not expose him, and he may act on this assumption unless the dangers are so open and apparent as to cause a man of ordinary prudence to appreciate them. Such is the rule declared here and by the Supreme Court of the United States in cases arising under the Federal Employers' Liability Act. (p. 51.)

5.  NEGLIGENCE—*Construction of Dangerous Instrumentality so Near Passing Engine That it is Likely to Strike it on the Way Constitutes Negligence on Part of Railway Company or of Those for Whose Negligence Railway Company May be Held Responsible.*

The construction of a dangerous instrumentality so near a passing engine that it is likely to strike it on the way con-

stitutes negligence on the part of the railway company or of those for whose negligence the railway company must be held responsible.    (p. 53.)

6.   DAMAGES—*Judgment for* $53,750.00 *Covering Pecuniary Loss of Decedents Beneficiaries and Damages for Conscious Pain and Suffering Under Evidence Showing Deceased Was Forty-Two Years' of Age and in Good Health and That Prior to His Death He Earned from* $300.00 *to* $450.00 *Per Month, Two-Thirds of Which Was Devoted to Wife and Infant Children Was so Grossly Excessive as Calling for Reversal.*

The verdict and judgment for plaintiff in this case for $53,750.00, covering the pecuniary loss of decedent's beneficiaries, and also damages for his conscious pain and suffering endured for fifteen days before his death, the evidence showing that he was forty-two years of age and in good health, and that within the three years prior to his death he had earned from $300.00 to $450.00 per month, two-thirds of which he devoted to the maintenance of his wife and two infant children, aged respectively two and four years, was not so grossly excessive as under the rules and principles applicable and enunciated here and in the federal courts calls for reversal.    (p. 53.)

7.   SAME—*Where Jury Did Not and Were Not Directed to Apportion Amount of Verdict Among Beneficiaries Court Will Not Assume That They Included a Greater Amount for Infant Children Than Under the Law and Facts They Were Entitled.*

Where, as in this case, the jury did not and were not directed to apportion the amount of their verdict among the beneficiaries, the court will not assume that they included a greater amount for the infant children than under the law applicable and the facts in evidence they were justly entitled to.    (p. 57.)

Error to Circuit Court, Mingo County.

Action by Sirrilda Looney against Norfolk & Western Railway Company.   Judgment for plaintiff, defendant brings error.

*Affirmed.*

*F. M. Rivinus, Duncan, Holt & Duncan,* for plaintiff in error.

*Jas. Damron, Randolph Bias* and *Ira J. Partlow,* for defendant in error.

MILLER, JUDGE:

This action was instituted by plaintiff for the wrongful death of her husband, George Oscar Looney, under section 8069 Barnes' Federal Code, 35 Stat. 65, for the benefit of herself as his surviving widow and their two infant children, George Oscar Looney, Jr., and Irwin Wilson Looney, aged respectively five and two years, laying the damages at $100,-000.00.

On the trial, on a plea of not guilty, the jury returned a verdict for $53,750,00, upon which the circuit court pronounced the judgment now before us for review. After verdict, defendant moved the court to set it aside and award it a new trial, basing the motion on two grounds, viz: First, that it was contrary to the law and the evidence; and, Second, that it was excessive in amount; which motion the court took time to consider. At a later day, and before the court had announced its conclusion on the motion for a new trial, defendant by writing undertook to state as grounds for its motion, in addition to the two first named, the following, viz: (1) The said verdict is contrary to the law of assumption of risk, applicable to the evidence in the case, and by said verdict the defendant is, therefore, deprived of a right, privilege and immunity claimed by it under the Act of Congress and Amendments thereof, commonly known as the Federal Employer's Liability Act, under which this action was brought. (2) The court erred upon the trial of said action in giving to the jury instructions contrary to the Federal Employer's Liability Act. (3) The court erred upon the trial of said action in giving plaintiff's instructions No. 1, No. 2 and No. 3. (4) The court erred upon the trial of said action in refusing to give proper instructions offered by defendant. (5) The court erred upon the trial of said action in the admission of improper testimony offered by the plaintiff. (6) For other reasons to be hereafter assigned at bar. The court overruled the motion, and entered judgment for plaintiff for the full amount of the verdict.

On the hearing here counsel for defendant, in their petition for a writ of error and in their oral argument, in enumer-

ating the errors relied on for reversal, say that the court below erred in refusing to grant the defendant a peremptory instruction, because, as they contend, the undisputed evidence, both for plaintiff and defendant, shows that plaintiff's decedent, with full knowledge and perfect appreciation of the dangerous condition of the tipple, voluntarily continued to pass through the same without complaint or notice to the railway company, and in doing so assumed the risk. A proper answer to this proposition, we think, is, first, that no such peremptory instruction was requested, and, second, that the court did, by defendant's instructions numbers 1 and 3, as properly modified, fairly submit to the jury the question of Looney's assumption of risk, if they should find from the evidence that he knew of the location of the car retarder mentioned in the evidence and knew and appreciated the risks and dangers incident thereto, or that such risks and dangers were so apparent that an ordinarily prudent person in the exercise of ordinary care would not have continued to work, and that with such knowledge he continued to operate his engine along and under such dangerous instrumentality, they should find for the defendant. The evidence did not, in our opinion, justify such a peremptory instruction, and as the modified instructions presented to the jury the theory of assumed risk, defendant was deprived of no right pertaining to that theory of defense, and that that ground for reversal is wholly without merit. A party can not properly complain on writ of error of an adverse ruling when no such ruling was invoked in any way in the trial court.

Plaintiff's instruction's numbers 1, 2 and 3, complained of but not seriously urged here, we think covered the law of the case on her theory of defendant's negligence in failing to furnish decedent with a reasonably safe place to work. The only thing seriously urged against either of these instructions relates to number 2, which told the jury in effect, that if they found for plaintiff they should assess her damages at such sum as would compensate the widow and the two children for the pecuniary loss sustained by the death of the decedent, and that their verdict should likewise include such sum as

from the evidence would compensate for the conscious pain
and suffering of the deceased sustained by him and before
his death, *such total sum so found by them not to exceed one
hundred thousand dollars.* The only thing urged against this
instruction is that the part underscored practically told the
jury that the ''bridle was off'', and that they were at liberty
to do anything they chose within the $100,000.00, the amount
sued for. We do not think this direction was improper. The
practice here indulged in has had, if not the approval, at
least the denial of reversible error therein, in the following
cases. The effect of the direction was simply to limit the
jury in its findings to the amount sued for. *Keathley* v. *Chesa-
peake & Ohio Ry. Co.,* 85 W. Va. 173, 102 S. E. 244; *N. and
W. Ry. Co.* v. *Earnest,* 229 U. S. 114, 57 Law. Ed. 1096. And
in 2 Robert's Federal Liability of Carriers, section 631, it is
said: ''It is not ordinarily error for the trial court in the
instruction on the measure of damages to make reference to
the amount which plaintiff is suing for as stated in the com-
plaint or declaration.'' Besides, in this case, how could the
jury have been invited to go beyond proper limitations when
the same instruction limited them to compensatory damages
and in addition damages commensurate with the conscious
pain and suffering of deceased, as stated, and when on this
question the parties introduced evidence showing the age and
life expectancy of the deceased, the amount which he was
earning, and the proportion thereof which he appropriated
to the support of his wife and children, supplying the basis
for their verdict, which the statute giving the right specifically
authorizes? We perceive no error in this instruction. The
only case urged against this instruction is *Hollinger* v. *York
Railways Co.,* 225 Pa. St. 419, 74 Atl. 344.

The questions remaining for our consideration and dispo-
sition relate to the merits of plaintiff's case as presented by
the pleadings and evidence, and the alleged excessiveness of
the verdict of the jury. A question presented on the re-
jection of a part of the testimony of the witness J. Q. Wright
bearing on the subject of deceased's knowledge of the condi-
tion of the coal tipple and car retarder when going under

them at the time he received his injuries, will be disposed of in connection with our consideration of the question of his knowledge and his assumption of the risk.

Looney, as the declaration alleges and the evidence shows, was a railroad engineer of experience, and a very careful one in the management of his engine. He was forty-two years of age and had been in the employ of the defendant company for many years, most of the time in operating loaded and empty coal cars on the main line from Williamson to Cedar, thence across Tug River by means of the Poplar Creek Branch to the coal plant of the Majestic Collieries Company, his train being known as the Poplar Creek Shifter. His duties consisted of taking away the loaded cars and serving the collieries company with empties from day to day, as the business demanded. The plant of the collieries company was the only one operating on said branch. The tipple where the accident occurred was built over four tracks and was supported by bents or upright posts from ten to twelve inches square placed upon cement pillars between each of the four tracks, numbered from the hillside toward the creek, as tracks number 1, 2, 3, and 4. Tracks 1 and 4 were used for the delivery of empty cars, which were pushed under and stored on the tracks above the tipple from where they were dropped down for loading. Generally in placing the cars in this manner, the engines were required to go under the tipple and between the posts or bents, between which the clearances were not very ample. Above the tipple the collieries company had a car retarder, so-called, consisting of a wheel or pulley installed on a horizontal shaft, over which ran a cable or belt, all controlled by a lever in the tipple, and used for dropping down and spotting the cars as required for loading them. It was necessary that this car retarder should be installed high enough above and away from the tracks as to furnish sufficient clearance for the engines and cars in passing under the tipple; and with the exception of the occasion on which Looney met his injuries subsequently resulting in his death, the evidence fails to show that any serious accident had ever resulted there to employees of the railway company. In

fact just prior to this accident another engine on the same train had passed up and down under the tipple and retarder in safety, as engines and cars had been doing for a long time. The car retarder could be seen if one's attention was called to it, but there was little evidence tending to show that Looney's attention had been especially called to it then or at any time. The tipple and tracks belonged to the collieries company, but the defendant was required to operate its engines and cars over the tracks and under the tipple, as indicated, in the discharge of its duties as a carrier. The engines used by Looney and other engineers in these operations were what were known as Class "M" engines, and were supposed to be of the same dimensions, though the evidence shows that they were not of the same size, attributable to differences in construction and as affected by wear and tear on the wheels of the engine. On the day Looney was injured, as already noted, the other engine in his train, operated by another engineer, had safely passed under the tipple and car retarder, but immediately afterwards when Looney operating his engine known as No. 388 attempted to go under the tipple on the same track, number 4, his cab caught the pulley of the retarder and was torn from the boiler to which it was fastened by iron bolts, leaving holes in the boiler through which the steam and hot water escaped into the cab where Looney was, burning him so severely that he died as a result thereof in about two weeks, wherefore this suit.

The main proposition relied on by defendant's counsel is that because of Looney's long services and his knowledge of the location and character of this car retarder, and the dangers incident thereto, which he must have appreciated, and his continuance in the service of the defendant thereafter without notice or complaint, he must be held as a matter of law to have assumed the risk, precluding recovery in an action based on the Federal Employers' Liability Act of Congress. In support of this proposition reliance is had on *Southern Pacific Co.* v. *Berkshire*, 254 U. S. 415. In that case, by a divided court, it was held upon the facts there presented that the deceased as a matter of law should be deemed to have

assumed the risk incident to the operation of his train over defendant's tracks in close proximity to the mail crane, installed pursuant to regulations of the post office department, and which were so apparent and obvious that he must have known the danger incident thereto. We had occasion recently to consider and distinguish that case from the one we had in hand, in *Leitch* v. *C. & O. Ry. Co.*, 97 W. Va. 498, involving, as the federal case did, injuries sustained from a mail crane. As we pointed out, the opinion in the federal case was predicated on the fact assumed that the mail crane doing the injury had been located in such dangerous proximity to the tracks pursuant to postal regulations and requirements. The minority opinion challenges the question of fact thus assumed, and the necessity for the dangerous construction. That case has also been distinguished in *Taber* v. *Davis, Director General,* 280 Fed. Rep. 612, and in *Wilson* v. *Director General,* 95 N. J. L. 482. In the latter case the deceased, a fireman on a locomotive engine, was struck and killed by a car standing on an adjoining track, far enough away to clear the engine, but not to allow the fireman to extend his head with safety beyond the side of the cab, and in backing the engine past the car the third time, his head came in contact with the car while he was presumably in the discharge of his duties, and he was killed. It was held that it was for the jury to say whether under the circumstances the fireman had assumed the risk of such accident, and that it could not be said as matter of law that the deceased had conclusively assumed the risk. In the federal case cited deceased, a brakeman, was killed by coming in contact with a canopy over a freight platform, and which was the only similar obstruction along defendant's railway. The question was whether the platform along the railway was reasonably safe to employees whose duties called them there. Deceased had worked there for six years; and it was held that it was not shown as a matter of law that he must have known of the existence and construction of the canopy over the platform.

Does the evidence support this proposition so relied on? Of course, if it does so in such a way as to warrant the taking of

the case from the jury, the plaintiff should not prevail. What is the evidence on this question? It is true defendant had been employed on this branch line for several years, and we may assume, if it is not proven, that he knew of the existence of the car retarder. It does not follow from this knowledge that he knew and appreciated the danger of running his engine under the tipple. The evidence shows that another engineer, on the same day of the accident, had driven an engine of the same model and class safely under the retarder, and he and other engineers had negotiated similar train movements there many times before that. There is conclusive evidence that Looney knew and appreciated that the clearances at the sides of the tipple were close, and that he had frequently warned his fireman to keep his head inside the cab in passing; for on one or two occasions, the evidence shows, the cab, because of the bad ballasting of the track under the tipple, had grazed the sides of the posts or bents of the tipple. Of course this condition was apparent to him, and on complaint the defendant had its workmen repair the track. But it was not this defect that resulted in Looney's death, but the car retarder installed over the track. A number of enginemen and firemen who had worked with Looney on the same branch for several years, testified that they had never during all the years of their employment come in contact with the retarder. One witness, J. O. Williams, the tipple foreman for the collieries company, living at Majestic, near the tipple, for five years preceding the accident, and who had general supervision of the tipple, remembered the time and incident when the cab and tender of Looney's engine rubbed the sides of the tipple, due to the bad condition of the track but not to the car retarder. He remembered of Looney running engines under the tipple a number of times, but could not remember whether either of them was No. 388. Moreover the train record showed that between November 3, 1919, and January 23, 1924, the time Looney was injured, he had made forty-five trips on Class "M" engines, eleven of them with engine No. 388, the first trip with it being made November 9, 1923. Another witness, Ball, a conductor of twenty years service, sometimes on trains with Looney as engineer, and who was

conductor on Looney's train some two months before when his engine rubbed against the right timbers of the tipple on track number 4 due to. the bad ballast, said that they went under the tipple on track number 4 almost every time they went up there. Another trainman or two examined as witnesses were with Looney when in charge of engine No. 388 he had rubbed the sides of the tipple, but had not encountered the car retarder.

To bring home notice to Looney of the existence of the car retarder and his appreciation of the dangers incident thereto, defendant relied mainly on the evidence of the witness M. M. Williams, locomotive fireman, and W. Light, a locomotive engineer, both of whom it appears had signed statements prepared and submitted by one Yates, a claim agent of the defendant company, shortly after Looney's accident. They were witnesses for plaintiff. Williams was with Looney in the cab as he was being taken to the hospital at Williamson immediately after the accident, when he was suffering greatly from his burns. Referring to his conversation with Looney on the way, he testified that Looney said: ''Boys you see the condition I am in now, I have talked to the men up there time and time again about it. Now I am burned up. * * * I have told them time and time again up there about these things.'' Subsequently the witness testified: ''Q. He didn't say whom he had told? A. No, sir. Q. You don't know what he was referring to. A. I have no idea, but still I have an idea, too, that he was referring to the car retarder. I have an idea that he was referring to this car retarder. Q. You don't know? A. No, sir, I don't know.'' The witness Light, also on the cab that bore Looney to the hospital, referring to the same conversation with him, testified: ''Q. What did Looney say to you, or in your presence, after he was hurt and during the time you were bringing him up to the hospital at Williamson? A. Well, he said, 'I have talked to these people time and again about this,' and he says, 'Now look at me, I am burned to death,' or something to that effect. Q. What people? A. Well, he didn't say.'' The only other evidence imputing knowledge to Looney of the danger-

ous proximity of the car retarder to passing engines was the statement prepared by Yates for Williams and Light. We have observed the uncertainty of this imputation from the testimony of these witnesses when sworn on trial. With all fairness to Yates, we think it quite probable that in preparing these statements he misinterpreted what the witnesses had said to him on the occasion referred to. These statements were objected to, but were probably admissible as tending to show prior inconsistent statements. In as much as there is no evidence that Looney had ever before had trouble with the car retarder, but had swiped the sides of the tipple with his tender and cab, and in as much as it is not shown that he knew when on his way to the hospital just what had caused his injuries, it is not likely that he was referring to the narrowness of the way under the tipple which he had encountered on two or three other occasions, than that he had complained of the car retarder? No one connected with the collieries company was called to testify that Looney had ever complained to the company of the car retarder. Complaint had been lodged with the railway company about the condition of the track under the tipple when swiped by the engine, and that defect was subsequently repaired by the defendant. As far as the witness Williams would go on the stand was to say that he "had an idea" that Looney may have been referring to the car retarder, but he couldn't say. It occurs to us that if the dangers of the car retarder were so open and patent as to charge Looney with notice and appreciation thereof, why was it that some of the numerous other trainmen using the tracks had not observed it and made complaint, and why some superintendent or inspector of the railway company had not done so, and rectified the condition? And is it not fair to assume that if Looney had observed and appreciated the dangers, he would have complained? He had the absolute right to assume, without knowledge to the contrary, that the defendant was furnishing him with a reasonably safe place to work.

The law as declared here and elsewhere is that an employee of a railway company assumes all the ordinary risks of his

employment, but not the extraordinary risks and hazards to which the negligence of the railway company may from time to time subject him and to which he has the right to assume his employer will not expose him, and that he may act on this assumption unless the dangers are so open and apparent as to cause a man of ordinary prudence to see and appreciate them. *Dumphy* v. *N. & W. Ry. Co.*, 82 W. Va. 123, 95 S. E. 863, and federal supreme court and other cases cited; *Union Pacific Ry. Co.* v. *O'Brien*, 161 U. S. 451, 40 Law Ed. 766; *Harness* v. *B. & O. R. R. Co.*, 86 W. Va. 284, 103 S. E. 866; *Goshorn* v. *Wheeling M. & F. Co.*, 65 W. Va. 250, 64 S. E. 32; *C. & O. Ry. Co.* v. *De Atley*, 241 U. S. 310. In the case lastly cited Mr. Justice Pitney says: "According to our decisions, the settled rule is, not that it is the duty of an employee to exercise care to discover extraordinary dangers that may arise from the negligence of the employer or of those for whose conduct the employer is responsible, but that the employee may assume that the employer or his agents have exercised proper care with respect to his safety until notified to the contrary, unless the want of care and the dangers arising from it are so obvious that the ordinarily careful person under the circumstances, would observe and appreciate them." The burden of showing knowledge and appreciation of the dangerous condition of the railway track is upon the railway company as of other defenses. Richey on Federal Employer's Liability, (2nd Ed.), §73, note 45, §148, p. 306, note 14. "Although the defense of assumption of risk is established as a part of the law and will be applied in all cases fairly within the rule, it is, nevertheless, not a favored doctrine, but at best is artificial and harsh and should not be extended beyond its reasonable limits." 39 C. J. 689. And as said in Thornton's Federal Employer's Liability Act, (3rd. Ed.), at page 209: "As I construe the act, the risk that the employee now assumes is the ordinary danger incident to his employment, which does not include, since the passage of this act, the assumption of risk incident to the negligence of the carrier's officers, agents, or employees, or any defect or insufficiency due to its negligence, in its cars, engines, ap-

pliances, machinery, track, roadbed, works, boats, wharves, or other equipment.''

We think it is well settled that mere knowledge on the part of an employee, of the general location of such an obstruction as the car retarder involved in this case will not be sufficient to impute knowledge of the increased hazard resulting therefrom. *Texas & Pac. Ry. Co.* v. *Swearingen,* 196 U. S. 51, 49 Law Ed.. 382. On the contrary it has been held that the building of such a dangerous instrumentality so near a passing engine that it was likely to strike it on the way constituted negligence on the part of the defendant or on the part of those for whose negligence the railway company must be held responsible. *N. & W. Ry. Co.* v. *Beckett,* 163 Fed. 479; *C. & O. Ry. Co.* v. *Cowley,* 166 Fed. 283; *Choctaw, Oklahoma & Gulf Ry. Co.* v. *McDade,* 191 U. S. 64, 48 Law Ed. 96.

Now recurring to the evidence of the witness John Q. Wright, relating to the question of Looney's knowledge and appreciation of the dangerous location of the car retarder; the excluded evidence related, not specifically to the car retarder, but to the tipple. It was elicited on cross-examination. Defendant called this witness as its witness afterwards, and then had the opportunity to examine him on the question, but did not. We think the ruling was proper and constituted no error.

We are of opinion, based on the decisions cited, that the question of Looney's knowledge and assumption of risk due to the presence of the car retarder was properly submitted to the jury, and that a peremptory instruction to find for the defendant would have been erroneous. It is only where the danger is so open and obvious, and the opportunity or knowledge on the part of the employee is so complete as to leave no doubt that he knew, or should have known all about it, that the question becomes one of law for the court. *Lynchburg Foundry Co.* v. *Dalton,* 121 Va. 480.

We now come to the last, and as is generally true in cases of this kind, the most troublesome question, the quantum of the verdict and judgment. It is conceded by counsel for plaintiff that the verdict found by the jury may seem exces-

sive. But the jury were properly instructed in accordance with the statute giving the right of action, as to the proper measure of damages, limiting the same to such sum as will compensate the widow and two children for the pecuniary loss sustained by the death of the husband and father, and to such additional sum as from the evidence will compensate for the conscious pain and suffering of deceased after the injury and before his death. The evidence showed the good health of deceased, his age, and the wages he was earning before and at the time of his death, the latter being $300.00 per month or $3600.00 per year; and that he appropriated to the maintenance and support of his wife and children about two-thirds of his earnings; so that it was possible to calculate by reference to mortality tables introduced in evidence, and other authorities, the earning power of money, taxes thereon, the ages of the children, with some degree of certainty the amount of the pecuniary loss. Counsel on the respective sides of the case have endeavored to sustain and discredit the amount of the verdict, on their different contentions as to the elements to be considered. Defendant's counsel, by reference to tables and data other than the American Experience Tables, say that the verdict is too large by several thousand dollars, limiting the amount included for damages for conscious pain and suffering to what they contend would be a reasonable sum. According to the Carlisle tables, Looney's life expectancy, omitting the fraction, was 26 years. And according to tables published in Giauque and McClure on Dower, Curtesy and Annuities, $15.9828 invested at four per cent for 26 years would produce $1.00 per year, and then become exhausted. So that to provide for an annuity of $2400.00 per year for 25 years, would require an investment of $38,358.72. The difference between this sum and the amount of the verdict is $15,391.28. So that if the jury should have been properly limited to the data on which this calculation is based, the latter sum would represent the allowance for conscious pain and suffering. In the *Dumphy* case we concluded, and we think rightly, that four per cent. was about the highest net rate that could be counted on for a safe, non-taxable invest-

ment security, or a safe security that would be subject to taxation. Counsel for plaintiff in this case contend that the plaintiff should not be limited to an annuity of $2400.00, but that based on the average rate of Looney's earnings during the last three years of his life, an annuity of $3000.00 should be included in the estimate. If so, the investment required would be $47,948.40. If the jury took this view, then they must have included in their verdict for conscious pain and suffering $5,801.60. There was evidence that Looney had earned within two or three years of his death $450.00 per month, or $5,400.00 per year. The average would be $4,500.00 per year, two-thirds of which would be $3,000.00, the figures which furnish the basis of counsels' argument. Can we properly say, in the absence of any other elements affecting plaintiff's right, that the verdict was influenced by bias, prejudice, partiality, or corruption on the part of the jury, or was it based on some wrong theory or in violation of some rule of law? Unless we can so find from the record, our decisions and many others say we should not invade the province of the jury in their right to fix the amount of such indeterminate damages. Among these are: *Normile* v. *Wheeling Tract. Co.,* 57 W. Va. 132; *Gibbard* v. *Evans,* 87 W. Va. 650; *Corrick* v. *Western Md. Ry. Co.,* 79 W. Va. 592, 91 S. E. 458; *Holt* v. *Otis Elevator Co.,* 78 W. Va. 785, 90 S. E. 334, (Syl. 5). In *St. Louis, Iron Mt. & So. Ry. Co.* v. *Craft,* 237 U. S. 648, 59 Law Ed. 1160, the suit was to recover for the pecuniary loss of the father of the deceased, deceased having had no wife or children, and for his conscious pain and suffering. The jury found $1,000.00 for the pecuniary loss, and $10,000.00 for pain and suffering. The trial court entered judgment on the verdict, and on appeal the Supreme Court of Arkansas reduced the finding of $11,000.00 to $5,000.00, the evidence showing that the deceased survived his injuries by only about thirty minutes. On writ of error the Federal Supreme Court affirmed the judgment, holding that it involved a question of fact not reviewable by that court. In *Kansas City So. Ry. Co.* v. *Leslie,* 238 U. S. 599, 59 Law Ed. 1478, the action was for $10,000.00 for pain and suffering endured, and for

$15,000.00 for pecuniary damages to the wife and young child. The verdict was for $25,000.00, to which a remittitur of $7,000.00 was entered, and the judgment on the verdict so reduced, of $18,000.00, was affirmed by the Supreme Court of Arkansas. To the objection by defendant in the Federal Supreme Court, that the trial court had erred in permitting recovery of pecuniary loss, and also for the conscious pain and suffering endured (less than two hours), the court replied that the recovery for both causes in one action was justified by the statute, and as the statutes does not require a separate finding, the judgment was, therefore, not open to attack in that court. As already observed, Looney survived his injuries about two weeks, and the evidence shows that he endured great pain and suffering during that time : it also appears that he was conscious all that time, and up to within a few moments of his death.

Counsel for defendant argue that the life expectancy of a railway engineer is not as great as the class of persons covered by the American Experience Tables, based as they are on insurable lives, and cites us to *Midway National Bank & Trust Co.* v. *Davis,* 228 Mo. 563; *Gill v. B. & O. R. R. Co.,* 302 Mo. 317, 331; and other cases bearing on the question. The latter case involved liability under a state, not the federal statute. The state statute subsequently adopted the Carlisle Tables as the basis for calculation in cases covered thereby. These tables are not based, as are the American Experience Tables, on insurable lives, but on the entire population of certain places, and are therefore better adapted to the ascertainment of damages resulting from death by wrongful act. Giauque & McClure's Dower, Curtesy, and Annuity Tables, pp. 1, and 195, et seq. In the estimates made herein we have followed the Carlisle Tables, as the better adapted to hazardous employments, and given the defendant the benefit of the fractions of time.

We concur in the observations of plaintiff's counsel in their brief, that in measuring verdicts in this class of cases, it is proper to take into consideration the diminished purchasing power of money, and to have regard to the increased

cost of living. *Lorillard* v. *Clay*, 127 Va. 734, 104 S. E. 384;
3 A.L.R. 605, and note p. 610; 10 A.L.R., note p. 179; 18
A.L.R., note p. 564.

We do not in this connection overlook the argument of
counsel for defendant that the jury may not have given
proper consideration to the fact that the two infant children
were not entitled to recover for any pecuniary loss beyond
the period of their minority, because they could not reason-
ably anticipate any support from their father beyond that
time, wherefore the recovery should be reduced by a sum
equivalent to their share of the annuity to accrue for the
years subsequent to that time and for the remainder of the
father's life expectancy. But as the jury did not and were
not asked to apportion their findings among the several
beneficiaries, how do we know, unless from the amount of
the verdict, that this element was not fully considered by
them. In *Chafin* v. *N. & W. Ry. Co.*, 80 W. Va. 703, the
question of damages for conscious pain and suffering was
not involved. The sole question was the proper amount of
recovery for the pecuniary loss to the beneficiaries. We
concluded in that case that the amount of the verdict was
too large considering the age of the child, the earning pow-
ers of the deceased, and other elements, and evidenced the
fact that something more than the pecuniary loss of the
beneficiaries had been included, wherefore the verdict was
excessive in that amount. This was because, as Judge WIL-
LIAMS said, there was nothing in the case to indicate that
the child could reasonably expect to receive anything from
his father after obtaining his majority. The statute, it will
be observed, does not limit the children of deceased to their
infancy. If there had been any pleadings and evidence show-
ing a greater right or a reasonable expectation of financial
aid and assistance beyond the age of infancy, allowance
therefor would have been proper; the statute does not limit
recovery to infant children; it only requires a showing of
reasonable expectation of benefits beyond infancy. 2 Rob-
erts Federal Liabilities of Carriers, §620, citing *N. & W. Ry.
Co.* v. *Holbrook*, 235 U. S. 625. Other cases bearing on the

question are: *Gulf C. & S. F. R. Co.* v. *McGinnis,* 228 U. S. 173; and *McGarvy's Guardian* v. *McGarvy's Admr.,* 163 Ky. 242. In the *Holbrook* case, however, there was no evidence showing or tending to show any right to anticipate aid from the father beyond the time of his legal liability to support the children. It was said in *Mich. Cent. R. R. Co. v. Vreeland, supra,* that the recovery is not dependent on legal liability. One of the elements of recovery recognized by some of the authorities is the value, if it can be measured in money, of the care, counsel, training and education which the child could reasonably expect from the father. But to justify the inclusion of any sum for such loss, there must be some evidence of the parent's character, personal qualifications, and the interest he took in his family toward those ends. Pecuniary benefit as contemplated by the statute would cover such loss, if established by proof. Roberts Federal Liabilities of Carriers, §§612, 618, *Louisville & N. R. R. Co.* v. *Halloway's Admr.,* 168 Ky. 262. No evidence having been offered in this case justifying the jury in including anything in their verdict for pecuniary loss to the children from loss of care, counsel, training and education, we can not assume that anything was included for such loss.

Counsel for defendant base their argument against the verdict on the theory that decedent would have continued to devote two-thirds of his earnings to his wife and two children, or until the children reached their majority, and that the wife, after the children became of age, would then continue to be limited to the original sum apportioned to her. But might she not reasonably anticipate that if the children's support should be terminated on attaining their majority, her allowance would be increased by the amount previously devoted to the children's support? She would have to maintain a home for herself, and likely for them for a time at least. She would not put them out of her home, no mother would do that, and to maintain such a home, if the husband had not lost his life by wrongful death, she could have reasonably anticipated an increase in her support for all purposes. We find no direct decision on this question, and we do not find it necessary to decide it, in

order to sustain our conclusion to affirm the judgment. The recovery here is in a lump sum, and as to how it shall be apportioned between the children will be determined no doubt hereafter by the proper tribunal.

Any doubt we may maintain on any of the questions involved, we must resolve in favor of the judgment below, for it is our duty to affirm unless the judgment is plainly wrong.

*Affirmed.*

### ON PETITION FOR REHEARING

On petition for a rehearing, which we are of opinion to deny, attention is called to our failure to observe that the record shows a motion by defendant's counsel, overruled, to direct a verdict for defendant. As the assignment of error seemed to relate to a written instruction, we expected to find it among the other instructions covered by the special bill of exceptions, and not finding it there, we overlooked the motion covered by the order of the court. However, the oversight does not in our judgment affect the conclusion reached, as the opinion will show. We add this note simply to correct the error in the record.